JAY F. CARLISLE, Appellant, *v.* ALFRED L. NORRIS et al., Respondents.

Stockbrokers — not necessary to return identical certificates of stock pledged — when same certificates may be used to make another delivery to same pledgor — evidence — when party may ask to have truthfulness of testimony given by own witness on behalf of opponent submitted to jury — pledge of stock — accounting — embezzlement by employee of stockbroker, who acted as agent of pledgor — when stockbroker not liable.

1. Stockbrokers discharge their obligations by accounting for the number of shares pledged with them even though they do not return the identical certificates which have been pledged.

2. Where stockbrokers have delivered certain certificates of stock to an agent of their pledgor and subsequently the same certificates come into their possession again in a proper way, there is no reason why they should not use them to make another delivery to or upon the order of said pledgor.

3. Where a party to an action first calls a witness and relies on him to give substantial evidence necessary to establish his cause of action, he in effect vouches for his reliability and credibility, and

thereafter, even though the witness is called by the other side, he cannot give evidence to impeach him or assert without evidence that he is not to be believed. He may, however, ask to have the truthfulness or accuracy of testimony given by such witness on behalf of his opponent submitted to a jury if that testimony is inherently improbable or is contradicted in respect of any material facts by other evidence in the case, even though it be that given by the witness himself.

4. In an action brought on the theory that the defendants had sold shares of stock belonging to the plaintiff and had received the proceeds thereof to and for the benefit of the latter, and had then refused to pay the same over upon demand, it appeared that an employee of the defendants also acted as agent of the plaintiff with extensive authority. He hypothecated the shares in question and deposited the proceeds with defendants as payment on an account in which he was interested. The question presented is whether the defendants are responsible for his acts. *Held*, on examination of the facts, that the embezzler abused the trust reposed in him by plaintiff rather than acted as agent of the defendants.

5. A witness called by plaintiff testified to facts tending to prove his case and to others negativing his right to recover. Plaintiff insists that he is entitled to take advantage of the witness' testimony which is beneficial to him, but asserts that he is entitled to have the jury say whether the remainder of his testimony is truthful. *Held*, on examination thereof, that there is nothing inherently improbable in the evidence; that under the circumstances the witness appears as one whose general credibility and reliability is vouched for by plaintiff, and his evidence cannot be rejected upon mere suggestion supported by no evidence or contradicting probabilities.

6. Plaintiff further contends that even though the embezzler, as his agent, had possession of and hypothecated the shares of stock, the proceeds of that misappropriation came into the possession of defendants so marked that the latter must or should have known that a wrong was being perpetrated upon plaintiff. *Held*, upon examination of the evidence, that there was nothing in the transaction which was justly calculated to excite the suspicions of defendants or their representative, and, in the absence of evidence which would justify a jury in convicting them of bad faith because not pursuing an inquiry into the origin of the check which came into their hands through him, recovery of its proceeds cannot be had.

*Carlisle* v. *Norris*, 157 App. Div. 313, affirmed.

(Argued June 9, 1915; decided July 13, 1915.)

26

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered July 24, 1913, upon an order reversing a judgment in favor of plaintiff entered upon a verdict and directing a dismissal of the complaint.

The nature of the action and the facts, so far as material, are stated in the opinion.

*William N. Dykman* and *Edgar M. Cullen* for appellant. Plaintiff had a clear right to have the truth of Graham's statement passed on by the jury, which was at liberty to discredit it. (*Elwood* v. *West. Union Tel. Co.*, 45 N. Y. 549; *Wohlfahrt* v. *Beckert*, 92 N. Y. 490; *Kavanagh* v. *Wilson*, 70 N. Y. 177; *Koehler* v. *Adler*, 78 N. Y. 287; *Saranac, etc., R. R. Co.* v. *Arnold*, 167 N. Y. 368.) The evidence discloses facts which were sufficient to notify Oliphant & Co. that this was a fraudulent transaction. The money was not Brouwer's, and, therefore, they cannot become innocent purchasers for value. The circumstances under which they received the check were suspicious. (*Ward* v. *City Trust Co.*, 192 N. Y. 61.)

*Harold Otis* for respondents. It cannot be seriously urged (nor, as we understand, is the contention made) that Oliphant & Co. are chargeable with their employee's knowledge of the transaction in question, simply because he was their employee, since he was acting therein solely for his own benefit. (*Brooklyn Distilling Co.* v. *Standard Distilling Co.*, 193 N. Y. 551; *Bienenstok* v. *Ammidown*, 155 N. Y. 47; *Benedict* v. *Arnoux*, 154 N. Y. 715; *Henry* v. *Allen*, 151 N. Y. 1.) Oliphant & Co.'s receipt of the money in good faith and for value is secure against the plaintiff. (*Nassau Bank* v. *Bank of Newburgh*, 159 N. Y. 456; *Goshen National Bank* v. *State*, 141 N. Y. 379; *Newhall* v. *Wyatt*, 139 N. Y. 452; *Southwick* v. *First National Bank*, 84 N. Y. 420; *Stephen* v. *Board of Education*, 79 N. Y. 183.)

HISCOCK, J. This action was brought to recover a substantial sum of money on the theory that the defendants had sold 200 shares of stock belonging to the plaintiff and had received the proceeds thereof to and for his benefit and had then refused to pay the same over upon demand. The plaintiff recovered judgment at the Trial Term, but the Appellate Division reversed this judgment and directed judgment upon the entire case for the defendants. The latter, therefore, in order to sustain this disposition of the case must establish that there was no evidence which presented a question of fact in favor of plaintiff and that the defendants were entitled to an order of nonsuit or to the direction of a verdict in their favor. (*Middleton* v. *Whitridge*, 213 N. Y. 499.)

The important and underlying question in the case is whether 200 shares of stock which were wrongfully hypothecated by a certain individual were so pledged by him acting as the representative of the defendants so that they were chargeable with the proceeds which were realized or by him acting as an agent of the plaintiff, and the facts presenting this question will first be stated, the following ones being established by evidence which either is not or cannot successfully be challenged on this appeal:

The defendants are the survivors of a firm which under the name of James H. Oliphant & Company had its principal place of business in New York city and transacted the business of bankers and brokers. The plaintiff also was a broker who executed orders on the floor of the Stock Exchange for other brokers, was a specialist in certain stocks, and transacted a large "in and out" business on his own account. He had his headquarters in the office of the defendants and they carried stocks for him on a margin and "cleared" his stock transactions. Their relations extended over a considerable period and were extensive in their character and plaintiff had the right to, and about once a month did, examine their books for

the purpose of testing the accuracy of his accounts kept therein.

One Brouwer was an employee of the defendants and intrusted with extensive powers, but he did not have charge of making loans for them, did not deliver or receive securities to and from their customers and did not have charge of the defendants' securities including those held for customers. Brouwer also was intrusted by the plaintiff with extensive authority as his agent. Amongst other things he had the key to the safe deposit box containing his securities and he was given blank "fly" powers which were stock transfers executed by the plaintiff in blank and which on being attached to a certificate of stock operated as a transfer thereof; for a long period including the times involved in this action he delivered to and received from defendants all of plaintiff's securities which were pledged with the latter; he made deposits for him, indorsing his checks for that purpose, and he was intrusted with checks signed by the plaintiff in blank to be used for the latter's benefit. The plaintiff himself testified in substance that he intrusted Brouwer with such powers in his behalf as were confided to no other person. Brouwer in the end proved a criminal and misappropriated 200 shares of American Tobacco preferred stock belonging to the plaintiff.

Plaintiff had in his account which was being carried by defendants several hundred shares of the preferred stock of the American Tobacco Company. All of this concededly has been accounted for save 200 shares and only 400 shares are involved in the consideration of the question whether said 200 shares have been accounted for. For several months prior to June 26, 1906, the defendants thus held as margin 200 shares of this American Tobacco stock, preferred, represented respectively by certificates Nos. A9371 and A9372, and these shares had been by the defendants in turn, with unquestioned right, pledged as security for a loan made by them with the National City

Bank. June 28th, 1906, Brouwer hypothecated these shares with a broker as security for a personal loan of upwards of $17,000, which was paid by a broker's check payable to the order of defendants, and by Brouwer deposited to the credit of the latter in their bank as payment on an account had by one Bird with the defendants, and in which account Brouwer was interested, and it is to recover these proceeds thus paid to defendants that this action is brought on the theory that Brouwer was acting as their agent in disposing of the plaintiff's stock, and that, therefore, he is entitled to recover such proceeds. Some time subsequently defendants had a settlement with plaintiff in which they accounted by means of different certificates for 200 shares of American Tobacco preferred stock on account of the 200 shares which had originally been pledged with them and by them with the bank as above stated, and it may be assumed that on the evidence thus far summarized and showing such settlement defendants would be entitled to a dismissal of the complaint so far as concerns plaintiff's theory of recovery now under discussion. When they accounted for the number of shares pledged with them they discharged their obligations, even though they did not return the identical certificates which had been pledged. (*Stewart* v. *Drake,* 46 N. Y. 449.)

But evidence was given which plaintiff says tended to establish that 200 additional shares of this same stock belonging to him were delivered to defendants and by them substituted for other stock held by the bank, and that it was this latter stock which the former accounted for, thus leaving the original 200 shares misappropriated by Brouwer to be accounted for. The testimony on this subject is as follows:

One Graham was defendant's cashier, and as such he had the custody of their securities during business hours, looked after loans made by them with the banks, and delivered and received securities to and from customers.

He gave evidence which was corroborated by entries in defendants' books to the effect that on May 2, 1906, while the National City Bank held the original 200 shares of Tobacco stock pledged by plaintiff with defendants and by the latter with the bank, Brouwer acting in behalf of plaintiff delivered to him as additional margin for plaintiff's accounts with defendants 200 shares of American Tobacco stock preferred represented respectively by certificates Nos. A9473 and A9564 for 100 shares each, and that on June 26th following Brouwer obtained back from defendants through him said last certificates on the ground that there was an excessive amount of margin for plaintiff's account. This was two days before Brouwer converted the original 200 shares pledged with the bank and represented by certificates A9371 and A9372, and in addition to showing Brouwer in possession of these last described certificates when he fraudulently hypothecated them the evidence shows that when defendants paid their loan at the bank and received back their securities there were delivered to them the certificates which Graham had delivered to Brouwer June 26th. The defendants' argument of course is that for some reason and in some manner Brouwer had exchanged at the bank the certificates which had been delivered to him as plaintiff's agent by defendants in June for the shares which had originally been pledged with the bank and that, therefore, he had possession of the latter as plaintiff's agent when he converted them.

Plaintiff needed part of the evidence given by Graham in order to establish his case. As already stated, defendants had established a defense to his claim to recover the proceeds received from the pledge of his stocks originally held by them represented by certificates A9371 and A9372 and pledged with the bank when they showed that they had accounted for these shares in specie or through other certificates of like amount and character, and it then became necessary for him to show that they

had received from him 200 other shares which were thus being accounted for, leaving the original 200 shares still in their hands. This evidence was furnished by Graham alone when he testified that Brouwer had deposited with defendants 200 additional shares of stock which had subsequently been substituted with the bank for the original shares which had been pledged with it. But while plaintiff insists that he is entitled to take advantage of Graham's testimony concerning the *receipt* by defendants of this additional 200 shares, he asserts that he is entitled to have the jury say whether the testimony of Graham is truthful when he says that he subsequently *returned* to Brouwer as agent of plaintiff said 200 shares and this because Graham who gave this evidence favorable to defendants was a witness interested in their success.

Of course if it be true that defendants on June 26th through Graham returned to Brouwer as plaintiff's agent the last 200 shares which had been pledged with them in May that only left to be accounted for the 200 shares originally pledged with the bank, and inasmuch as defendants subsequently did account for 200 shares they would be relieved of responsibility and Brouwer's act in hypothecating the 200 shares which he obtained by exchange from the bank would be as agent for plaintiff.

Much stress is placed upon the fact that on their theory the defendants discharged their responsibility by delivering twice to plaintiff or for his benefit the same shares of stock represented by certificates Nos. A9473 and A9564, first by delivering them to Brouwer as plaintiff's agent on June 26th and second by delivering them to or upon the order of plaintiff in October when the certificates had been received by defendants from the bank and they were having their settlement with plaintiff. But I do not see any force in the argument that defendants' case is weakened merely because the same certificates were delivered twice or a dozen times in discharging their liability. The important question will be as to the

conditions under which said repeated deliveries were made. If it be true that defendants delivered certificates Nos. A9473 and A9564 to Brouwer as agent of plaintiff in June and that subsequently through the action of Brouwer or somebody else these certificates were substituted for those originally deposited by defendants with the bank and thus when this loan was paid up came into their possession again in a proper way, there is no reason why they should not use them to make another delivery to or upon the order of plaintiff.

Thus the decisive question becomes the very narrow one whether defendants are entitled to have it held as matter of law that Graham told the truth when he testified that he redelivered to Brouwer as plaintiff's agent on June 26th the 200 shares of stock which had been last pledged with the defendants in May or whether Graham was such an interested witness that the plaintiff was entitled to have a jury pass upon the credibility of his evidence. In the disposition of this question I shall assume and am inclined to think that if it were to be decided by reference to the facts alone that Graham was called by the defendants and gave evidence in their behalf tending to establish a redelivery of plaintiff's stock to Brouwer he would be such an interested witness that plaintiff could insist that a jury should pass upon his credibility although not contradicted in any manner. He was not only interested in defending his employers against a substantial claim but in view of his powers and duties it might very well be that unless he could establish that this stock was redelivered to Brouwer, giving him an opportunity to exchange certificates with the bank, he himself might be subjected to accusation or suspicion of wrongful or negligent conduct in allowing Brouwer to somehow obtain possession of the certificates so originally pledged with the bank and later converted. But the facts thus stated are not the only ones to be considered in deciding this question. There are other circumstances which

in my opinion barred plaintiff from the right to question the general credibility of Graham. He himself first called Graham as a witness and relied on .him to give substantial evidence necessary to establish his cause of action. By doing this he in effect vouched for his reliability and credibility, and thereafter, even though he was called by the other side, he could not give evidence to impeach him and of course if he could not give evidence to impeach him he could not assert without evidence that he was not to be believed. (*O'Doherty* v. *Postal Tel.-Cable Co.*, 113 App. Div. 636; *Hubner* v. *Met. St. R. Co.*, 77 App. Div. 290, 292; *Coulter* v. *Am. Merch. Un. Ex. Co.*, 56 N. Y. 585; *Hunter* v. *Wetsell*, 84 N. Y. 549; *Thompson* v. *Blanchard*, 4 N. Y. 303, 311; *Fall Brook Coal Co.* v. *Hewson*, 158 N. Y. 150.)

In the latter case the court was considering whether a witness called and sworn in behalf of one party and dismissed before he gave any material testimony in his favor and thereafter called and giving material testimony in behalf of the opposite party might be impeached by the side which had first called and dismissed him. The court held that a party did not necessarily make a person his witness by merely calling and swearing him and that impeachment was allowable in that case where the witness had been .dismissed as above stated. But considering the principle applicable where a person was called as a witness by both sides, the court reaffirmed the rule laid down by Greenleaf as follows: " When a person offers a witness in proof of his cause, he thereby, in general, represents him as worthy of belief. He is presumed to know the character of the witnesses he adduces, and having thus presented them to the court, the law will not permit the party afterwards to impeach their general reputation for truth, or to impugn their credibility by general evidence tending to show them to be unworthy of belief. For this would enable him to destroy the witness if he spoke against him, and make him a good wit-

ness if he spoke for him, with the means in his hand of destroying his credit if he spoke against him."

This rule which thus prevents plaintiff from attacking or impugning the general credibility of Graham, however, does not prevent him from asking to have the truthfulness or accuracy of his testimony submitted to a jury if that testimony is inherently improbable or is contradicted in respect of any material facts by other evidence in the case even though it be that given by the witness himself. (*Becker* v. *Koch*, 104 N. Y. 394; *Cross* v. *Cross*, 108 N. Y. 628; *President & Directors of Manh. Co.*, v. *Phillips*, 109 N. Y. 383; *Sharp* v. *Erie R. R. Co.*, 184 N. Y. 100, 106.)

In other words, while plaintiff may and must take advantage of the evidence given by Graham that he received from Brouwer 200 shares of stock in May, he doubtless may ask the jury to determine whether the evidence of the same witness that he returned the same stock to Brouwer a few weeks later is to be believed if the evidence in regard to the latter transaction is improbable or is contradicted in any manner by other evidence in the case, and, therefore, it becomes necessary to determine whether the evidence of the return of the stock is vulnerable in any of these respects.

There is nothing inherently improbable in the evidence. It cannot be successfully questioned that Brouwer was authorized by plaintiff to deliver and receive stocks for him and had habitually performed such transactions, and it is equally unchallenged that it was part of Graham's duty to receive and deliver stocks from and to customers. Even if it should be assumed that defendants in order to establish their defense must assume responsibility for the fact that after this stock was delivered to Brouwer it was by him or somebody else exchanged for plaintiff's certificates, which had been originally pledged with the bank, I do not think that we can say that that fact is inherently improbable. There is no evidence of the rules or customs

which govern the exchange of securities held by a bank, and in the absence of such evidence it is not at all difficult to believe that Brouwer, who had long been in the employ of the bank's debtors, or some one else, upon some pretext might procure it to exchange certain shares of stock held by it as security for an equal number of shares of the same stock represented by different certificates. The bank would have no interest in the exchange, and in the absence of some evidence showing that such an exchange would be contrary to some rule or custom governing the subject of securities or that it would excite suspicion there seems to be no reason to doubt that it was made.

There not only is no evidence tending to contradict Graham's testimony of the redelivery of these certificates, but all the evidence which there is tends to corroborate it. Defendants' books were produced containing entries asserted and appearing to have been made at the time corroborating it. The accounts which appeared on these books and which contained a large number of entries and which were subject to examination by and had actually been examined by plaintiff from time to time were accepted as correct in respect of all items save this particular one. There is no opportunity for Graham to have made an honest mistake in respect of this matter. It either occurred as he stated or else he was guilty of perjury and very likely of wrongful conduct in allowing Brouwer to obtain possession of the certificates which were subsequently hypothecated by the latter. Under the circumstances, appearing as a witness whose general credibility and reliability is vouched for by plaintiff, his evidence cannot be rejected upon mere suggestion supported by no evidence or contradicting probabilities.

Therefore, I reach the conclusion on this branch of the case that defendants accounted to plaintiff for all of his stock which they had and that in hypothecating the 200 shares of which plaintiff seeks the proceeds from defend-

ants Brouwer was abusing the trust reposed in him by plaintiff rather than acting as agent of the defendants.

But there is a second theory upon which it is urged the case should have gone to the jury. It is said that even though Brouwer as agent of plaintiff had possession of and hypothecated the shares of stock belonging to the former, the proceeds of that misappropriation came into the possession of defendants so marked that the latter must or should have known that a wrong was being perpetrated upon plaintiff, and the consideration of this theory requires the statement of some additional facts especially pertinent to it.

Brouwer hypothecated plaintiff's shares with a broker named Langharr and Langharr cleared the transaction through the brokerage firm of Beekman & Company. By direction of Brouwer the latter firm made their check payable directly to defendants. At this time defendants were carrying one or more accounts for a man named Bird, and one of these accounts was called the "Bird San Francisco" account. Brouwer to the knowledge of Graham was interested with Bird in this account. When Brouwer obtained from Beekman & Company the check he deposited it to the credit of defendants in their bank and Graham being absent directed the latter's assistant "to enter that amount of money in that account [the Bird account]; that he had just sent a check to the bank for that amount of money," and thereupon the assistant made an entry on the blotter, "W. H. B. Ck.  W. H. Bird account, S. F., $17,541.25." When Graham noticed this entry upon his return he asked his assistant about the item, who gave the explanation of Brouwer's direction just stated. The following morning Graham asked Brouwer "What that check was that he sent to the bank and he said it was some money he had made with Lou," "Lou" concededly meaning Langharr.

It is urged that these circumstances are so suspicious that defendants should have traced the check whereby

the payment was made back to its source and that if they had done so the true nature of the transaction producing such check would have been disclosed.    The main reliance for this argument seems to be that the item entered upon the defendant's blotter indicated that the check was that of Bird whereas it was the check of the brokers, and that when Brouwer explained to Graham that it represented some moneys he had made with "Lou" it was apparent that the entry was a lie and suspicion should have been excited.    The primary trouble with this theory is that there is no evidence that Brouwer made any representations concerning the identity of the maker of this check which were false or which Graham knew or understood to be false.

As stated above, Brouwer who alone appears to have had possession of the check simply told the clerk as Graham was informed "to enter that amount of money in that [Bird] account; that he had just sent *a* check to the Bank for that amount of money."    The assumption that it was Bird's check apparently was made by the clerk who entered the transaction.    But Graham was not misled by this assumption for the clerk repeated to him Brouwer's statement that he had sent the bank *a* check. Thus when Graham later was informed by Brouwer that the check "was some money he had made with Lou," there was not the slightest inconsistency between the payment and Brouwer's statement to excite suspicion.    I think the same thing might be said if we should overlook the only evidence that there is and assume that Brouwer directed the check to be entered as Bird's.    The two men were jointly interested in the account with defendants on which the payment was being made. Graham knew that they were thus speculating together and if he understood that Brouwer had paid on that account Bird's check which represented some money Brouwer had made in some stock transation, what was there about this that should have excited suspicion?    When Brouwer

applied on a conceded indebtedness against Bird the latter's check, it does not seem to me to have put defendants on guard that the check represented moneys which in their joint account dealings Brouwer rather than Bird had the more directly realized. If Brouwer was satisfied to have moneys which he had realized paid over to and by Bird, no one else had any apparent interest in the matter. If Bird had attempted to pay on his indebtedness moneys belonging to Brouwer a different aspect might have been presented, but as it is I fail to see why defendants should have suspected that any wrong was being done, and least of all that Brouwer was stealing stocks from or otherwise wronging some absolute stranger to the transaction.

Still again, if we assume in spite of the evidence that defendants knew this check was drawn by Beekman & Company no different result would follow. As a matter of fact, no one appears to have seen this check except Brouwer, and when he received the check and deposited it to defendants' credit in the bank for the purpose of making a payment to them on an indebtedness in which he was interested, there can be no doubt that he was acting in his own behalf and interest, and defendants were no more chargeable with his knowledge of the form of the check than with his knowledge of its origin. (*Brooklyn Distilling Co.* v. *Standard Distilling & D. Co.*, 193 N. Y. 551; *Bienenstok* v. *Ammidown*, 155 N. Y. 47, 58, 59; *Benedict* v. *Arnoux*, 154 N. Y. 715, 728, 729.)

But assume that they did learn that the check was drawn by one firm of brokers while Brouwer claimed to have made the money represented thereby with another broker, and that this was such a suspicious discrepancy as required investigation and explanation, the truth with which they would be chargeable would have supplied the perfectly satisfactory explanation that Beekman & Company simply cleared a transaction for the broker named by Brouwer.

Therefore, I think that there was nothing in this transaction as the evidence actually shows it to have occurred which was justly calculated to excite the suspicions of defendants or their representative, and further that even if it be assumed that they are to be charged with knowledge that the check was drawn by Beekman & Company instead of by Langharr with whom Brouwer explained he had made the money, inquiry would have elicited such a truthful explanation of this apparent discrepancy as would have dissipated any suspicious appearances. The defendants were not bound at this time to treat with Brouwer as a thief; they had a right to assume that he was an honest man. They were not bound to conjure up all such doubts and suspicions, if any, as might have been suggested to the mind of a very vigilant and mistrustful person. Even negligence would not defeat their right. They were simply bound to act honestly and in good faith and in the absence of evidence which would justify a jury in convicting them of bad faith because not pursuing an inquiry into the origin of the check which was given them, recovery of its proceeds cannot be had from them on the theory now discussed. (*Cheever* v. *Pittsburgh, S. & L. E. R. R. Co.*, 150 N. Y. 59, 65, 66; *Second Nat. Bank of Elmira* v. *Weston*, 161 N. Y. 520, 526; *Rochester & C. T. P. R. Co.* v. *Paviour*, 164 N. Y. 281, 284; *Ward* v. *City Trust Co. of N. Y.*, 192 N. Y. 61, 72.)

If defendants received the proceeds in good faith and without notice of any wrong and credited them on an indebtedness due them, plaintiff is not entitled to recover them back. The suggestions in substance that defendants did not know of Bird's indebtedness when the payment was made and that with full knowledge of Brouwer's fraud they nevertheless gave Bird the benefit of the disputed payment are not sustained by the evidence. There is no question that Bird owed defendants much more than the amount of the payment when the

latter was made. Graham simply pleaded ignorance of its precise amount at the time. It is true that a final settlement was made with Bird after the discovery of Brouwer's misconduct in which credit was allowed for the payment made by him; but that is not material. The real question is of the situation which existed several months before when the payment was received and credited on the account. (*Nassau Bank* v. *Nat. Bank of Newburgh*, 159 N. Y. 456, 459, 460; *Goshen Nat. Bank* v. *State of N. Y.*, 141 N. Y. 379; *Newhall* v. *Wyatt*, 139 N. Y. 452.)

I recommend that the order and judgment of the Appellate Division be affirmed, with costs.

WERNER, CHASE, COLLIN, MILLER and CARDOZO, JJ., concur; WILLARD BARTLETT, Ch. J., dissents on ground that there was a question for the jury.

Order and judgment affirmed.