(No. 16300.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BENJAMIN JOHNSON, Plaintiff in Error.

*Opinion filed December 16, 1924.*

1. CRIMINAL LAW—*general rule as to whether conviction may be had on uncorroborated testimony of an accomplice—review.* A conviction may be had upon the uncorroborated testimony of a confessed accomplice; but such testimony is liable to grave suspicion and should be acted upon with the utmost caution, and a conviction resting on such testimony will not be confirmed unless the record is free from substantial and prejudicial error.

2. SAME—*what is not proper impeachment of witness.* A party cannot impeach a witness called by him by proving that the witness has on some other occasion made a statement different from the one he makes in court, and the prosecution should not be permitted to impeach witnesses who were first called as witnesses for the People by attempting to show by cross-examination of their testimony for the defense that they had made contrary statements when testifying before the grand jury.

3. SAME—*witness should not be asked immaterial and insinuating questions.* In a prosecution for larceny of chickens a witness

for the defense should not be asked whether she or her husband had ever been tried for stealing chickens, where the only apparent purpose of such question is to prejudice the witness with the jury; and the defendant, testifying in his own behalf, should not be questioned on the collateral and immaterial subject of how many times he had been in court before.

4. SAME—*what is not proper examination in chief.* In a prosecution for larceny, an attorney and a detective who questioned the defendant in the county jail should not be permitted to testify, as evidence in chief, that the defendant said he did not know from whom he got the property he is charged with having stolen, as such testimony is proper only in rebuttal, in case the defendant, in testifying in his own behalf, denies making such statement.

5. SAME—*when instruction that alibi must cover entire time of commission of crime is not proper.* Where the case against the defendant on trial for larceny consists entirely of the uncorroborated testimony of a confessed accomplice while the defendant by several witnesses establishes an alibi accounting for his presence for several hours of the time covered by the story of the accomplice, the jury should not be instructed that "to render the defense of an alibi available the evidence must cover the whole of the time of the commission of the alleged crime," thereby depriving the defendant of the benefit of the testimony.

WRIT OF ERROR to the Circuit Court of Will county; the Hon. A. W. DESELM, Judge, presiding.

SCHUYLER, ETTELSON & WEINFELD, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT W. MARTIN, State's Attorney, and EDWARD C. FITCH, for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Plaintiff in error, Benjamin M. Johnson, who was convicted in the circuit court of Will county of burglary and larceny and sentenced to imprisonment in the penitentiary, prosecutes this writ of error to review the judgment.

Thomas Tong, the complaining witness, testified that some person or persons entered his chicken house during the

night of March 4, 1924, and stole therefrom a large number of white Wyandotte chickens; that he did not know the exact number stolen but estimated the loss to be about eighty; that a band was placed around the leg of each chicken raised during the season of 1923 so as to distinguish it from the older chickens; that some of them were marked with pink celluloid bands and others with a piece of insulated copper wire; that three days after the chickens were stolen he found some of them at the place of business of Charles Madeja, in Chicago Heights, and others at the place of business of Amedeo Farina, in the same city; that one of the chickens found at Farina's place was identified by him because it was crippled and walked in a peculiar manner; that the other chickens were identified because they had on their legs celluloid and wire bands similar to those with which he had marked his young chickens; that he had no other means of identifying the chickens except by the fact that they were white Wyandottes and were marked as his chickens were marked; that he took thirty chickens home and placed them in a pen for two days; that then he let them out of the pen and they immediately mingled with the chickens he had at home and went into the chicken house with them.

Both Madeja and Farina testified that they bought chickens on the morning of March 5 from Henry Wigand; that they had ordered chickens the evening before from Benjamin Johnson, (plaintiff in error,) and that Wigand delivered the chickens for Johnson; that they paid for the chickens by delivering to Wigand checks payable to the order of Johnson. A banker at Beecher, at whose bank Johnson conducted his business, testified that Johnson deposited the two checks March 6; that $100 was credited to his account and $20.34 was paid to him in cash.

Over the objection of plaintiff in error, an attorney, Elmer Bielfeld, and a detective, Edward Powers, testified that they visited plaintiff in error in the county jail at Joliet and

asked him from whom he got the chickens which he deliv-
ered to Madeja and Farina; that he replied that he bought
them from a man who came to his place of business in the
afternoon of March 4 but that he did not know the man.

Henry Wigand testified that he had been employed by
plaintiff in error since December 20, 1923; that both of
them boarded at the home of Louis Fick; that he and
plaintiff in error passed the Tong farm in the afternoon
of March 4; that they saw a great many chickens about
the farm; that Johnson remarked that that was a handy
place to steal some chickens; that he and Johnson left the
Fick place about eleven o'clock in the night of March 4 in
witness' Gray coupe automobile; that they drove to the
neighborhood of the Tong farm and left the automobile
on a side road about a quarter of a mile from the chicken
house; that they walked to the chicken house, entered it
and filled thirteen sacks with chickens; that they carried
them across the orchard to a point near where the automo-
bile was standing; that they made two trips from there to
Johnson's place of business, where the chickens were placed
in coops and loaded onto Johnson's Ford truck; that they
reached Johnson's place with the first load about four o'clock
A. M. and with the second load about an hour later; that
he delivered the chickens the following morning to Madeja
and Farina; that he left Johnson's place with the chickens
shortly before six o'clock A. M.; that Johnson gave him a
personal check for $40 and $20 in cash as his half of the
receipts from the stolen chickens.

Plaintiff in error testified that he was in the produce
business at Beecher; that his place of business was located
at the residence of Louis Fick; that he bought and sold
poultry, eggs and butter; that Wigand was employed by
him; that they lived at the Fick residence; that the Fick
family was composed of Mr. and Mrs. Fick and their daugh-
ter, Amanda; that all of them ate supper at the Fick resi-
dence shortly before six o'clock in the evening of March 4;

that Wigand drove away from the Fick residence immediately after supper; that Wigand did not return home that night; that he did not see him again until he saw him return about 6:30 o'clock the next morning; that Mr. and Mrs. Fick left the house shortly after supper and went to a party at the home of one of the neighbors; that they returned home about midnight; that he and Amanda Fick remained at the Fick residence all of the evening of March 4; that they had installed a new radio and were listening to the program; that after Mr. and Mrs. Fick returned all of them listened to the radio program until about one o'clock, when the Fick family retired; that he remained at the radio for a short time and went up-stairs to bed about two o'clock; that as he went to bed he spoke to Mrs. Fick and told her to call him about six o'clock; that he arose about six o'clock, had his breakfast and prepared to deliver chickens to his customers, Madeja and Farina, in Chicago Heights; that the night before the chickens had been placed in coops, which were then put on the truck and covered with a canvas; that the chickens placed in the coops were of many colors; that he had purchased them from people living in the neighborhood of Beecher, including a Mr. Reaman, a Mr. Hayden and a Mr. Werman; that many of the chickens were white; that he did not remember whether their legs were marked with bands but that he assumed many of them were, because it was a common practice in that neighborhood; that he sent the chickens to Chicago Heights by Wigand; that Wigand returned to him about noon and delivered to him two checks, which he deposited in the bank; that Wigand told him he wanted to make a payment on his automobile, and that he gave him a check for $40; that he owed Wigand for services more than $40 at that time; that he did not give Wigand any cash on that occasion; that he did not steal any chickens with Wigand and did not know that Wigand had stolen any chickens; that he did not say to Bielfeld and Powers that he did not know the man from whom he bought

the chickens, but that he did say to them that he could not give the name of the party or parties from whom he had bought them until he looked at his duplicate bills; that as soon as he was released from jail he consulted his bills and found the names of the persons from whom he had bought the chickens.

Mrs. Edith Reaman testified that she had sold poultry, eggs and butter to plaintiff in error on three occasions during the year prior to March 4, 1924; that on that date she sold him about 350 pounds of poultry at twenty cents a pound and some butter at fifty cents a pound; that the chickens she sold him March 4 were of mixed colors, and consisted of white Plymouth Rocks, white Wyandottes, barred Plymouth Rocks, black Minorcas, Leghorns and Rhode Island reds; that she could not say what portion of those she sold him were white Wyandottes but that many of them were; that she and her husband delivered the chickens to Johnson's place of business in their Ford car; that many of her chickens were marked with celluloid bands around their legs; that it was her practice to mark the chickens of each season with a celluloid band so that she could distinguish the young from the old; that she did not know that any of her chickens were marked with insulated wire; that at the time she sold the poultry and butter to plaintiff in error on March 4 he gave her a bill; that she took the bill home and placed it on a file. She produced the bill, and it showed a sale to plaintiff in error on March 4 of 350 pounds "mixed hens" at twenty cents a pound and sixty pounds of butter at fifty cents a pound.

Both Madeja and Farina testified on behalf of plaintiff in error that the chickens delivered to them by Wigand the morning of March 5, 1924, were of many colors; that most of the chickens were white but that there were many of other colors. Madeja testified that the white chickens taken from his place of business by Tong were not chickens that

had been purchased from Wigand but were white chickens which he had purchased from Arthur Boyer, of Madison.

Mr. and Mrs. Fick testified, in substance, that plaintiff in error lived and conducted his business at their home, just outside the limits of Beecher; that plaintiff in error and Wigand ate supper with them about 5:30 P. M. on March 4; that Wigand left immediately in his automobile and did not return to their house until about 6:30 o'clock the following morning; that they left shortly after supper and went to a party at the home of one of the neighbors; that they returned from the party shortly after eleven o'clock and found plaintiff in error and their daughter, Amanda, listening to a radio program; that they listened to the program until about one o'clock, when they went to bed; that plaintiff in error did not go to bed until about two o'clock; that as he went by their bed-room door he spoke to them and asked to be called at six o'clock that morning; that they arose shortly before six o'clock and called plaintiff in error; that he came down-stairs and had breakfast with them; that the stairway was not carpeted and they would have heard Wigand or plaintiff in error if they had used it during the night; that Wigand was not home when the rest of the family ate breakfast and that they saw him drive into the barnyard in his automobile shortly after they had finished breakfast; that he came in and after he had eaten breakfast took the truck-load of chickens to market; that their daughter, Amanda, married plaintiff in error April 18, 1924.

The conviction of plaintiff in error rests wholly upon the uncorroborated testimony of Henry Wigand. According to his testimony he was a willing accomplice. Many courts of high respectability question whether any conviction resting on the uncorroborated testimony of a person who confesses his guilt and accuses another should be sustained. This court, however, has adopted the prevailing view that convictions may be sustained on such testimony. In adopting the view, however, this court has always held that such

testimony is liable to grave suspicion and that it should be acted upon with the utmost caution. If such tainted testimony were not so regarded, the life or liberty of the best citizen might be taken away on the accusation of the real culprit, made either to shield himself from punishment or to gratify his malice. (*Hoyt* v. *People*, 140 Ill. 588; *Campbell* v. *People*, 159 id. 9; *Waters* v. *People*, 172 id. 367; *People* v. *Pattin*, 290 id. 542.) A conviction resting on such testimony will not be confirmed unless the record is free from substantial and prejudicial error.

Madeja and Farina were first called as witnesses for the prosecution and later were called as witnesses for the defense. After they had given their testimony in chief for the defense, they were asked, on cross-examination by the State's attorney, whether they had not testified before the grand jury that all the chickens purchased by them from Wigand were white. They denied that they had so testified, and stated that they had testified before the grand jury that most of the chickens they had purchased from Wigand were white. In rebuttal the prosecution called a member of the grand jury, who testified that both witnesses told the grand jury that Wigand sold them white chickens, and that neither of them mentioned in their testimony that Wigand had sold them chickens of any other color. It was error to permit the prosecution to impeach these witnesses. There is no rule of evidence more firmly established than that a party cannot impeach a witness called by him by proving that the witness has on some other occasion made a statement different from the one he makes in court. (*Chicago City Railway Co.* v. *Gregory*, 221 Ill. 591; *American Hoist and Derrick Co.* v. *Hall*, 208 id. 597; *Rockwood* v. *Poundstone*, 38 id. 199; *Richards* v. *State*, 82 Wis. 172, 51 N. W. 652.) This guaranty of credibility, if we may call it such, relates to the witness' general trustworthiness and not to the correctness of specific statements of fact. The guaranty being of the continuing single quality of trustworthiness, it is in-

separable and cannot be construed as existing for some statements and not for others. Therefore, if A calls a witness and obtains his testimony, and B afterwards calls him, A cannot impeach the credibility of the witness by proving that he has made statements out of court different from those made upon the witness stand, or by proving him to be of such general bad character as renders him unworthy of credit. (2 Wigmore on Evidence,—2d ed.—sec. 909; *Ellicott* v. *Pearl,* 10 Pet. 412; *Commonwealth* v. *Hudson,* 11 Gray, (Mass.) 64; *Carlisle* v. *Norris,* 215 N. Y. 400, 109 N. E. 564; *Baltimore and Ohio Railroad Co.* v. *State,* 41 Md. 268; *Johnston* v. *Marriage,* 74 Kan. 208, 86 Pac. 461.) The testimony given by Madeja and Farina as witnesses for plaintiff in error was important, and it was reversible error to permit these witnesses to be improperly impeached.

The cross-examination of Mrs. Reaman concluded with this question: "Were either you or your husband ever tried for the crime of stealing chickens?" She had testified that she had delivered to plaintiff in error white Wyandotte chickens which were marked with celluloid bands on their legs. Tong claimed chickens found in the possession of Madeja, and based his claim on the fact that they were white Wyandotte chickens with celluloid bands on their legs. Mrs. Reaman's testimony accounted for Johnson's possession and sale to Madeja of chickens like those claimed by Tong. It was error to discredit her testimony by asking this insinuating and insulting question with no apparent purpose except to prejudice her with the jury. *People* v. *Garines,* (*ante,* p. 413.)

The testimony of Bielfeld and Powers, to the effect that Johnson, while being interrogated in the county jail, had said that he did not know the party from whom he purchased chickens during the afternoon of March 4, was not proper evidence in chief. If he had denied making such statement to them while he was a witness in his own behalf their tes-

timony would have been proper in rebuttal, but he did not deny that he made the statement to them, and says that he did say to them that he did not know the name of the seller without consulting his duplicate bills.

It was also error to examine Johnson at length on the collateral and immaterial subject of how many times he had been in court before.

In addition to denying his guilt of the crime with which he was charged plaintiff in error produced witnesses to prove his innocence by establishing an alibi. If the testimony of Mr. and Mrs. Fick is true then the testimony of Wigand is false. Notwithstanding this, plaintiff in error was not given the full benefit of the testimony of Mr. and Mrs. Fick, because the court told the jury, in an instruction, that "to render the defense of an alibi available the evidence must cover the whole of the time of the commission of the alleged crime." This meant that there was no probative force to the testimony of these witnesses, and that their testimony was entitled to no consideration because they could not say that plaintiff in error was under their personal observation from eleven o'clock P. M. to five o'clock A. M. on the night in question. They did testify positively that plaintiff in error was at their home from about 11 :30 o'clock P. M. to about two o'clock A. M. and that he was in his room at six o'clock A. M. They also testified that on account of the fact that the stairway was uncarpeted they would have heard him if he had walked down-stairs after two o'clock A. M. and had returned to his room up-stairs before six A. M. He was entitled to the benefit of this testimony notwithstanding the evidence did not cover the whole of the time of the commission of the burglary, and it was error to instruct the jury otherwise. *Waters* v. *People, supra; People* v. *Fisher,* 295 Ill. 250.

The judgment is reversed and the cause is remanded to the circuit court of Will county for a new trial.

*Reversed and remanded.*