(No. 24012.— )
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE RENDAS *et al.* Plaintiffs in Error.

*Opinion filed June 11, 1937.*

WILSON, J., dissenting.

JOHN V. CLINNIN, and D. A. TASIOPOULOS, for plaintiffs in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, BLAIR L. VARNES, and LESLIE V. CURTIS, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

A building occupied by a restaurant in Cicero, with its contents, was completely destroyed by fire on October 29, 1933. Nearly two years later, George Rendas, Stevens Stamatakis, (usually called Stamos,) Nick Gianacakos, George Besas and John Prevenas were jointly indicted by a grand jury in Cook county on a charge of burning the building. Besas and Prevenas were not tried, for reasons hereinafter shown. On a joint trial of the remaining three

before a jury in the criminal court of Cook county, Gianacakos was acquitted but Rendas and Stamos were, on the same evidence, found guilty, and were sentenced to the penitentiary. A reversal of their judgments of conviction is sought by this writ of error.

Gianacakos, a Greek merchant of considerable wealth, was one of the owners of the building destroyed, although legal title thereto was held, under a trust agreement, by the Northern Trust Company. The property was free of mortgage or other debt, and the insurance carried on the building was not excessive. Rendas leased the ground floor and basement for a restaurant conducted by himself and his mother-in-law. Their investment in fixtures, furniture and equipment represented $30,000 and was protected by an insurance coverage of only $7000. The restaurant equipment, fixtures and furniture were free of lien and fully paid for, and only a few small debts for current accounts were outstanding at the time of the fire. The cause of the fire was reported as "unknown" by the Cicero fire marshal soon after its occurrence, no suggestions of its incendiary origin were then made and, after the usual investigation by the insurance companies carrying the risks, adjustments and payments were made to the insured in due course. It was upon the stories told by Besas and Prevenas, two questionable characters from Minneapolis who volunteered their services for pay, through a disbarred attorney, that an indictment was later voted and the conviction secured. At the trial, they were granted a severance and used as principal witnesses for the People. After their arrest, these two were released on bonds and each received a weekly payment of $25 from January 1, 1935, up to the time of trial, and in addition were promised twenty per cent of any amount recovered by the insurance companies from Rendas and Gianacakos. These weekly payments and the agreement to share on a contingent basis in the proposed recovery, were made to them by the American

Board of Underwriters in recompense for their testimony and efforts in securing the conviction of Gianacakos and Rendas.

Although a conspiracy was not charged in any one of the four counts in the indictment, it was nevertheless the theory of the People, judged by the proof and argument presented, that Rendas and Gianacakos, desirous of collecting insurance money, had entered into an unlawful undertaking in the nature of a conspiracy with Stamos, Besas and Prevenas, whereby the last three named were to burn the building and restaurant contents for pay. On the other hand, the defendants contended that no such undertaking was ever entered into and that Besas and Prevenas had simply taken advantage of the occurrence of the fire to threaten and blackmail them. The principal error assigned by defendants is that the evidence produced by the People did not establish their guilt beyond a reasonable doubt. This entails our consideration of the testimony of the principal witnesses.

Prevenas testified for the People that he rode with Stamos from Minneapolis to Chicago in the latter's car on October 25, and there met Besas at the McQueen Hotel. He said he met Rendas that same evening but did not talk about burning the place. On the next day, October 26, he said that he again went to the Rendas restaurant with Stamos and Besas and saw these two talking to Rendas and Gianacakos, but did not hear any of their conversation. On the next day, the 27th, Prevenas said that they again drove to the restaurant in the afternoon but he and Stamos remained in the car, while Besas went in and later returned with $110. Much conversation alleged to have taken place between Prevenas and others out of the presence of defendants, was erroneously admitted by the trial court, over objections repeatedly made by defendants' attorneys. The quantity and character of this irrelevant and highly prejudicial testimony would, alone, afford sufficient ground for reversal,

if more important reasons did not exist. Prevenas admitted that he helped gather the materials used in starting the fire and helped Stamos put the inflamable material in the basement and ignite the fire. But his testimony is singularly silent as to any conversation with either Rendas or Gianacakos, or with others in their presence, concerning the planning or execution of the fire. If his irrelevant and hearsay testimony, to which objections were made, had been kept out of the record, Prevenas would have testified to nothing of an incriminating character up to the morning of October 29, 1933, when the fire occurred. At the time of the firing, Prevenas said he saw Rendas give Besas $90, which Besas brought over to Stamos and Prevenas; that upon protest over the insufficiency of this sum, Besas went back to Rendas to get more money. Prevenas followed him, did not engage in or hear any conversation between Besas and Rendas, but saw Rendas receive something, which Gianacakos took out of his pocket, and hand it over to Besas. This he said "was a roll of money about $100." He said they split the money three ways; that he got $60, Besas $65 and Stamos $65, and that all three left Chicago that same afternoon. Prevenas was then allowed to testify, over repeated objections, to alleged meetings and conversations with Rendas on later dates. He said he met Rendas in Minneapolis about December 20, 1933, and had a conversation with him on the street; that Rendas then gave him $150 and promised to pay more when he collected his insurance. He further testified that he again saw Rendas in the fall of 1934 at the Harrison Cafe, in Chicago; that Besas was with him; that Rendas did not give him anything at that time, but a week later, at the Northwestern depot, he and Besas again asked Rendas for money and Rendas allegedly replied: "Stamos collected $1200 and you fellows got $700. I won't pay any more. I can't pay any more, either me or Gianacakos." On objections, the court struck out the reference as to Gianacakos. On the same

evening Prevenas said he and Besas met Rendas and received $100 each from him. On cross-examination Prevenas admitted that although he was married, he had been living in open adultery with a "girl friend" in Minneapolis for about six or seven years; that his business was cooking and waiting on tables at different places as an extra, for which he received about "ten bucks" a week; that he was acquainted with Chisholm, a Minneapolis attorney who had been disbarred, and talked with him about this case in the fall of 1934, soon after he returned from Chicago to Minneapolis; that Chisholm had written to the insurance company, as a result of which an interview was secured with an insurance company representative named Brown. He testified that he could not read but that Chisholm, and another attorney named Simpson, secured a written offer to pay him "$25.00 a week, and twenty per cent out of what amount they collect back," and that he had been receiving these $25 weekly payments regularly. The witness also admitted that in his conversations with Brown, Simpson and Chisholm in the fall of 1934, he never mentioned anything about Stamos, or of Stamos' connection with the fire, and had not connected Stamos with the fire until after April, 1935.

Besas related that he became acquainted with Prevenas just a week before the fire; that he met Gianacakos and Stamos a few days before October 29; that Stamos was with Prevenas in Chicago when he first met him; that he came to Chicago October 22, a week before the fire, and talked with Rendas the same night, telling him he came from Minneapolis at the suggestion of his cousin Chris Carroll. In order to identify himself he said he showed Rendas letters that had passed between the cousins. He said he told Rendas it would cost $110 for the materials to start the fire, to which Rendas agreed, telling him to come back Friday. Over objections of defendants the witness was allowed to say he had read a letter written by Rendas,

wherein Rendas allegedly offered to pay $1500 to any person who came to Chicago and set fire to the building. The witness said he took Prevenas and Stamos to the restaurant on October 25 and introduced Rendas to them, saying: "This is the party came down to deal on the fire." Stamos asked a few questions about the insurance; Rendas replied that the place had cost him $30,000 and he formerly carried $15,000 of insurance but had cut it to $7000. Stamos then wanted to know why Rendas desired the place burned when he carried such a small amount of insurance, and Rendas allegedly said business was getting quiet and he did not care to "ride any longer." The next day Stamos and Besas walked into a booth with Rendas while Prevenas stayed at the lunch counter. Besas said Gianacakos came into the restaurant about 1:35 P. M. and entered the booth, where he met him for the first time; that Rendas told Gianacakos that Stamos was the man from Minneapolis to burn the building; that Gianacakos asked Stamos what he knew about fires, to which Stamos replied that he had been firing buildings and could do it again. According to witness, Gianacakos told Stamos that if he did a good job he would pay fifteen per cent out of what they collected as he had insurance on the building, and Rendas said the same thing to Stamos. Besas further said that on October 27, about 1 o'clock, he called on Rendas for the $110 and got it; "he delivered it to me while we were in the alley back of the restaurant. He obtained this money from Gianacakos; we went to his store which was a few doors from the restaurant and I heard Rendas ask him for the money and saw it delivered to him. The money was given to me and upon my return to the car where Stamos and Prevenas had remained, I gave the sum to Stamos. We then drove to Gary; there Stamos went off alone and came back in a short time with a box which he put into the car. I called Rendas from Gary and told him we were coming with the materials and asked him to wait at the restaurant." The

witness said they did not stop at any store while in Gary. The court, over objections of the defendants, allowed the People to refresh the memory of witness by asking him if he or Stamos went into a ten-cent store to buy anything. The witness then replied that they did go in but could not remember if anything was purchased. He said he went to work about 10 o'clock, as, early in the week, Rendas had told him if the deal to burn the place went through he, Besas, should go to work, so he started Friday (two days before the fire) as night cook. He saw Stamos and Prevenas about 2:00 o'clock the morning of the fire. He said he was alone in the restaurant when Stamos came in, secured the basement key, and went out the back door. About 3:15 he heard a noise in the basement and smoke broke out about half an hour later. Besas turned the fan on so the smoke would be drawn out and more noise made, and stayed inside until the smoke drove him out. The fire department arrived soon after witness telephoned in the alarm. Stamos and Prevenas appeared at the fire about 4:00 o'clock and were looking on, but Besas said he did not talk to them at that time. He saw Rendas somewhat later that morning and asked him for money. Rendas gave him some which he took across the street to Stamos and Prevenas, where the three counted the money, $90. Witness said Stamos told him to go back and get the other $100; that he went over to Rendas and asked for the additional money and was told to wait, he would get it; that witness went with Rendas to Gianacakos, who was standing nearby, and asked him for money and was given $100, which Rendas handed to witness. After receiving and dividing the money with his two alleged confederates, Besas said the three slept about three hours and left for Minneapolis.

Besas further testified that about five days before Christmas of the same year, Stamos, Rendas and he met in the Gladstone Cafe in Minneapolis; that he asked Rendas for money and received $250, out of which he gave Stamos

$50. He said he asked Rendas for the rest of the money and he declared it was given to Stamos and asked if Stamos had paid it over. Stamos is then said to have pulled a gun and declared: "If any of you fellows squeal, you know what is going to happen to you." In August, 1934, Besas said he and Prevenas saw Rendas in Chicago at the McEwan Hotel, and asked him for money but he refused to pay more. Besas said he then told him of having one of his letters and after some days Rendas paid each of them $100 and received the compromising letter from Besas.

Rendas and Gianacakos each testified in his own defense, and both emphatically denied any participation in or knowledge of any plan to set fire to the building, or the payment of any sum or sums of money to Besas or Prevenas for any such purpose. Stamos also denied any part in the burning, or the receipt of any money from anyone for that purpose, and, as will be hereafter briefly shown, gave what seems to us to be a satisfactory account of all his actions before and after the fire. Rendas had come to America from Greece in 1914, and settled in Minneapolis where he had become naturalized and worked until 1923, when he came to Cicero and bought the restaurant. He became acquainted with Besas in September, (not October) 1933, when the latter came into his place destitute and wanted work. Besas came in often during the ensuing weeks for food and was given small sums by Rendas and a waitress, for carfare and lodging. Rendas denied that Besas showed him any letter from Chris Carroll or anyone on October 22, and denied ever writing a letter to anyone offering $1500 if someone would burn his restaurant. He also denied that Besas had ever mentioned anything about needing $110 to buy materials to burn the building. About a week before the place burned Rendas employed Besas as night cook. He started to work on Monday, October 23, at $15 a week, and on the morning of the fire Besas said he was "flatbroke," requested his pay and Rendas paid him

$12 for the time he had been employed. Rendas did not become acquainted with Prevenas until after October, 1933, although he had known Stamos in Minneapolis since 1918. Around the twenty-fifth of October, 1933, Stamos came into the restaurant and asked Rendas if he did not remember him; at first Rendas did not, but finally recalled him. Stamos said he was in Chicago visiting his godfather and nothing further occurred between the two men. When the building was burned Rendas was home with his wife and family, and, when told of the fire, he went to the restaurant with his brother-in-law. He saw Besas at the fire, but did not see Stamos or Prevenas. During the fire, the iron safe . used by Rendas in his business, with $400 in currency in it, together with all his fire-insurance policies, a quantity of jewelry and other valuables, fell through the burning floor into the basement. After standing for some time in six feet of water, it was rescued by a garage mechanic the next day after the fire. When opened by one Smith, with the aid and in the presence of Rendas and three other persons, the currency and insurance papers were found intact, although water soaked, and were spread over tables and dried by the use of blotters. Rendas told of completely remodeling and refurnishing the restaurant in 1931. This included a new front, new sign, new fixtures, the re-decoration of the walls in modernistic design, new dishes, new service-bar and fountain and complete Frigidaire refrigeration, all costing $12,000, of which the refrigeration equipment, fixtures, pumps and motors cost $8000. All these improvements were completely paid for in 1932 and the chattel mortgage covering them released. At the time of the fire he said he owed no money on stock or fixtures except a balance of $190 on the soda fountain.

Rendas said he went to Minneapolis around Thanksgiving in 1933, on a combined business and pleasure trip. While there, he accidentally saw Besas (but not Stamos or Prevenas) at the Gladstone restaurant where Besas was

working. Besas talked to him at the time, seeking to interest him in the purchase of a lunch stand. He did not see Besas anywhere in May, 1934. The next time Rendas saw Besas was in Chicago in August, 1934, when Prevenas was with him. Besas telephoned him at the Harrison Cafe, where Rendas was working, and wanted to talk with him. After work he met the two at Harrison and Wabash streets and all walked over into Grant Park. Besas said Prevenas had information that Rendas and Gianacakos had set fire to the building for the insurance, and that a payment of $1000 from Rendas and $5000 from Gianacakos would quiet everything. Rendas said he told them "you go plumb to hell." He offered to go with them at once before the proper police officers. Besas telephoned him the next morning and wanted to know if he had changed his mind, but Rendas said "no" and hung up the receiver. Rendas said he did not report the attempted blackmail to the authorities because the two told him if he reported the matter, they would make it hot for him, and that it would be two against one. Rendas said he did report the affair to his attorney. He denied ever giving Besas and Prevenas $100 each, or any other sum, or of ever meeting them at the Northwestern depot or of ever seeing them again until 1935, at the State's attorney's office.

The story told by Rendas on direct examination was not damaged in its essentials on cross-examination. Throughout his testimony he directly and absolutely denied the occurrence of the alleged conversations or actions at the times mentioned by Prevenas or Besas, or at any other time. Rendas said he had to fill an appointment with his dentist between 2:30 and 3:00 o'clock in the afternoon of October 26, at the time he was alleged to have conversed with Stamos, Besas and Gianacakos in the restaurant booth. To reach the office of the dentist in time, which was on the far north side of Chicago, Rendas said he had to leave his place between 1:00 and 1:30 P. M. He traveled on the

elevated line and did not reach the office of the dentist until between 2:30 and 3:00 P. M. The dentist testified that Rendas came in his office that day between 2:30 and 3:00 P. M., received treatment and left about 4:00 o'clock. The appointment book of the dentist was introduced in evidence and disclosed the appointment was made prior to October 26. This book disclosed that Rendas had been receiving dental treatment on three different days of the same month prior to the 26th. Besas testified that Rendas met him and Stamos in Minneapolis five days before Christmas of 1933. A physician testified that on December 18, 21 and 22, he treated the daughter of Rendas for a swollen gland, and at each of these treatments the child was accompanied by her father, mother and nurse. When the office record of the physician showing these treatments (one of which included a minor operation under an anaesthetic,) was offered in evidence it was admitted without any objection on the part of the People.

Stamos testified that shortly before October 22, 1933, he wanted to collect some money due him in Gary, Indiana, as he needed it to enter into a contemplated business venture with one John Pappas. He borrowed an automobile and at the same time consented to haul an individual to Chicago. This person, previously unknown to him, was introduced as John Prevenas. The latter said he was a cook and was going to Chicago to obtain work. They were at Halsted and Harrison streets in Chicago on Wednesday, October 25, and Prevenas told him to wait a few minutes and he would return. He returned with a person and introduced him to Stamos as Besas. The latter informed them he was cooking at a restaurant in Cicero and if they would drive him down to work he would treat them to dinners. They accepted the offer and drove to the restaurant where Besas was employed by Rendas. This was between 6:00 and 7:00 o'clock in the evening. Stamos wanted to pay the check despite the offer of Besas and

went to the cash register. There he met Rendas who had been a Minneapolis acquaintance years before. After visiting with him for not over five minutes he walked out without speaking further to Besas and Prevenas. He went across the street and registered at a hotel. The next morning, (Thursday, the 26th,) he found Prevenas waiting for him, saying he had stayed in the same hotel. Prevenas tried to borrow some money from Stamos but the latter forestalled him by asking him to wait until the latter could determine what money he could collect in Gary. They agreed to meet later at Blue Island avenue and Halsted street. On the way to Gary, Stamos had lunch with a fellow Greek and delivered a message from Minneapolis. This companion traveled with him for a short distance and Stamos reached Gary in the middle of the afternoon. He went straight to a garage and left the car for repairs to the steering apparatus. After collecting $50 from his debtor he spent the night at his house and returned to Chicago Friday morning, where he met Prevenas at the prearranged place. He did not let Prevenas have any money but offered to haul him back to Minneapolis without charge. This offer was refused. After spending the night at a hotel on Halsted street, he met a friend, purchased some groceries and left for Minneapolis, which he reached that night, late. The next day, Sunday, October 29, he again borrowed the automobile and took John Pappas with him to Marshalltown, Iowa, on a business mission. They stayed at the Evans Hotel where Stamos registered as S. Stevens. He often used his first name, he said, because his last name, Stamatakis, was too long. He registered for Pappas and the two stayed in the hotel only one night. The next day, their business completed, they returned to Minneapolis. Cross-examination did not shake the testimony of Stamos to any degree on material points. He absolutely denied the testimony of Prevenas and Besas concerning his actions or declarations at the times and places indicated, or at any

other times and places, and said he never discussed or had anything to do with burning the restaurant. He denied receiving any of the sums of money mentioned by Besas or Prevenas or of being at any of their alleged conferences, and said he had never met Gianacakos until the first trial, in October, 1935. His story was well corroborated by the testimony of other witnesses who testified concerning his actions and whereabouts, at the times in question.

Gianacakos was discharged as not guilty by the jury which found Rendas and Stamos guilty. His testimony, which was undoubtedly believed by the jury in preference to the tales of Prevenas and Rendas, was in hearty accord with the stories of Rendas and Stamos, and corroborated their testimony whenever it dealt with the same set of circumstances, in respect to time, place and what was said or done.

The People's case must stand or fall upon the testimony of Prevenas and Besas. Prevenas had admittedly lived in an open state of adultery in Minneapolis for years. Besas, who appears to have engineered the scheme to extort money from both Rendas and Gianacakos, eked out a precarious existence as an itinerant cook. Chisholm, the attorney to whom they first went in order to make contact with the insurers, was a disbarred attorney, while the other attorney, Simpson, officed with Chisholm and appeared for him in the matter. On the other hand, Gianacakos and Rendas were substantial Greek businessmen who had been very successful in their business ventures. Their good characters were substantiated by the testimony of many witnesses. The record does not disclose that either Gianacakos or Rendas was so circumstanced financially that either would be benefited by a fire. On the contrary, the evidence does disclose that each suffered a distinct loss from the fire much greater than the insurance covered. Settlement for the losses was made by the companies involved in the February following the fire and the record is bare of any evidence

that the insurers believed the fire to be other than one on which the insurance was honestly due and collectible. The insurers did not take action on the theory that arson had been committed until Prevenas got in touch with them through the disbarred attorney.

The testimony of Prevenas and Besas, admitted accomplices, signally fails of corroboration in any of its essential and material details. Only one instance need be cited to show the failure of Prevenas and Besas to thoroughly dovetail their blackmail scheme with the actual facts. Stamos drove from Chicago to Minneapolis alone before Sunday, October 29. Prevenas knew this, as he had refused the proffered return ride to Minneapolis. Besas was working when the fire broke out and Prevenas was then in Chicago. The time elements, places and people visited by Stamos on this trip to Gary and return, fitted in so well with the other facts that he could not be eliminated from the stories of Prevenas and Besas. Therefore, in their testimony, they used him as the principal "torch" and had him leave Chicago in the borrowed car in their company. The register in the Evans Hotel in Marshalltown, secured by Stamos, trapped them in a lie, which threatened for a time to do them great damage, unless explained. In their stories, J. Pappas conveniently became Prevenas and Stamos remained his English equivalent, S. Stevens. Besas also had to be accounted for in Marshalltown, so he allegedly spent the night in the car. The evidence does not disclose any reason why Besas, who said he had $65 when he left Chicago, should spend an uncomfortable night in a Chevrolet sedan while his two presumed companions occupied comfortable hotel beds.

The testimony of Knol, the fire marshal, placed both Prevenas and Besas at the fire, and furnished the only corroboration in the record to any point, even slightly material. This testimony is not damaging to defendants because Besas was employed by Rendas as night cook and

was on duty at the time. The testimony about the presence of Prevenas can only be explained in two ways: Either the witness was mistaken in his identification months after the fire, or Prevenas was present as a mere spectator, since he was rooming at a nearby hotel where Besas had a room. Prevenas admitted he used the room of Besas when the latter was working and had to get out when Besas came off duty and wanted to sleep. Even if Prevenas was at the fire, the testimony of Knol sheds no further light and lends no credence to the stories told by Prevenas and Besas that they were hired and paid to burn the property, or to any other material issue of fact.

The verdict of guilty here rests substantially upon the uncorroborated testimony of Besas and Prevenas, self-confessed accomplices, who were indicted for the same offense. Their testimony, much of it inadmissible, much of it incredible on its face and other parts shown to be different from that given by them on a former trial, was made of further doubtful value by the fact they were each being paid $25 per week by the insurance companies and promised twenty per cent of any sum recovered by the companies if Rendas and Gianacakos were convicted. It is uniformly held that the testimony of an accomplice is always to be received with grave suspicion and acted upon with great caution. (*Hoyt* v. *People,* 140 Ill. 588; *People* v. *Alward,* 354 id. 357.) In weighing such testimony it is necessary to consider the influence under which it is given and whether the purpose of the witness is to shield himself from punishment, obtain some reward for himself or gratify his malice. (*People* v. *Johnson,* 314 Ill. 486; *People* v. *Pattin,* 290 id. 542.) For lack of material corroboration, or where the testimony of an accomplice is otherwise discredited, this court has not hesitated to reverse judgments of conviction. (*People* v. *Hudson,* 341 Ill. 187; *People* v. *Ravenscroft,* 325 id. 225; *People* v. *O'Hara,* 332 id. 436; *People* v. *Harvey,* 321 id. 361; *People* v. *Pattin,*

*supra.*) The purchased testimony here was insufficient to establish the guilt of Rendas and Stamos beyond a reasonable doubt. How any jury could have freed Gianacakos and on the same testimony have found Rendas and Stamos guilty is beyond our comprehension. Even if Besas and Prevenas were to be believed, their testimony involved Gianacakos with planning the fire equally with Rendas, and in furnishing practically all the money to pay the hirelings. The presumptions resting upon character and financial status were as applicable to Rendas as to Gianacakos. The evidence, if believed at all, warranted like treatment for these two defendants.

The ends of justice will not, under the circumstances, be advanced by remanding this cause for another trial. The judgment of the criminal court of Cook county is therefore reversed, without remandment. *Judgment reversed.*

Mr. JUSTICE WILSON, dissenting.