(No. 22343.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK KENDALL *et al.* Plaintiffs in Error.

*Opinion filed June 20, 1934—Rehearing denied October 10, 1934.*

STONE, DEYOUNG and HERRICK, JJ., dissenting.

ROBERT E. KAVANAUGH, for plaintiff in error Prief; I. R. WASSON, for plaintiff in error Kendall.

OTTO KERNER, Attorney General, E. V. CHAMPION, State's Attorney, and J. J. NEIGER, (CLARK B. MONTGOMERY, and CHARLES T. McELWEE, JR., of counsel,) for the People.

Mr. JUSTICE SHAW delivered the opinion of the court:

The plaintiffs in error, Frank Kendall and John Prief, were jointly indicted with Elmer Benson, Charles Smythe and Lloyd Cox, in the circuit court of Peoria county, on a charge of robbery while armed. Benson was found not guilty, Smythe was never apprehended, and another participant in the robbery, one Adams, was killed in the course of the hold-up. Kendall and Prief were found guilty and sentenced to an indeterminate term of from one year to life in the penitentiary and prosecute this writ of error.

The facts are in part controverted but appear substantially in the record as follows, depending to a considerable extent upon the testimony of the defendant Cox, who pleaded guilty and became a witness for the People:

Milka Marsh, a widow, together with her nineteen-year-old son, Stephen Marsh, lived at 1900 South Washington street, Peoria, Illinois, on the 14th of February, 1933. The premises occupied by them contained a front room which was once used as a restaurant but at the time of the occurrences herein mentioned was not open for busi-

ness. It had previously been used by the deceased husband of Mrs. Marsh for "bootlegging" purposes and had contained one or more slot machines. On the night of February 14, 1933, the defendant Cox and the defendant Smythe came to the side door of this building and demanded entrance, representing themselves to be deputy sheriffs. They called Mrs. Marsh's son by his first name, saying, "Steve, open the door; we are deputy sheriffs; where are the slot machines?" Having gained entrance to the building on this pretext they then displayed revolvers and demanded to know where the money was hidden, informing Mrs. Marsh and her son that they knew there was money hidden in a fruit jar and they were there for the purpose of getting it. She denied having any money, and Cox searched the basement and the steps leading into the garage without any success. They then threatened to kidnap Steve if she did not produce the money. The son told them he had ten dollars which had been given to him as a present, which he went and got while being kept under the leveled revolver of Cox. Upon Steve being taken out of the room Mrs. Marsh became hysterical and began to scream, whereupon the other robber started to beat her. There is some confusion in the testimony, but it appears that the robbers became panicky, and that Steve grabbed a butcher knife and cut Cox across the throat with it, whereupon both of the robbers ran. Steve secured a revolver from the dresser drawer, went to the door and started shooting, killing the man named Adams, who was sitting in the car, and wounding Cox with a bullet through the mouth. Smythe ran away and was never seen again, while Cox ran in another direction and down some railroad tracks and was later in the evening apprehended at a restaurant and taken to a hospital. He made a complete confession, and became, as above indicated, a witness for the State on the trial.

Plaintiff in error Prief is the owner and proprietor of the Floyd Hotel, at 200 Liberty street, Peoria, and plain-

tiff in error Kendall is in the slot machine and punch-board business in that city. Adams, who was killed in the hold-up above mentioned, was until that date a guest at the Floyd Hotel, and upon the trial it was the theory of the People that the robbery was planned in Adams' room at the Floyd Hotel upon information and instruction given by Kendall, assisted by the advice of Prief, who furnished the revolvers to be used and who expected a share in the proceeds of the crime. They were convicted as principals upon proof indicating them to be accessories before the fact, within the provisions of the Criminal Code. (Cahill's Stat. 1933, chap. 38, par. 611.) For proof of the necessary facts to sustain this part of the case the People depend upon the testimony of Cox, with such corroboration as appears in the record.

Cox testified that his home was in Decatur, Illinois, and that of the absent Smythe was at Terre Haute, Indiana; that in the early morning of February 14, 1933, they drove together to Peoria, it being the first visit that Cox had ever made to that city; that after being lost and making several inquiries they finally arrived at the Floyd Hotel, where Smythe claimed to have an appointment with Adams. Adams at this time was staying at the Floyd Hotel under the name of Baxter. He had been there a few days prior to the sixth of February, at which time he checked out. He returned on the ninth of February and stayed until the evening of the fourteenth, when he was killed. Baxter (or Adams) had told Prief, according to Prief's testimony, that if a man from Terre Haute inquired for him Prief should send him up and that "he was all right." According to the testimony of Cox, when he and Smythe reached the Floyd Hotel they inquired of Prief for Adams, but was told he had no one there by that name. Upon describing Adams, however, they were told by Prief to go up to room 10, which they did and there met Adams. The testimony covered the entire day,

and without going into too great detail, it is sufficient to say that it was Cox's story that Adams sent for Kendall, who came to the hotel about 9:00 o'clock in the morning; that they spent a good part of the day discussing among themselves some means of raising money for the purpose of carrying on counterfeiting operations in Oklahoma, which Smythe had under way. According to his testimony Kendall suggested the Marsh restaurant and home as a likely place for a hold-up. He told them, according to Cox, that he had seen boot-leg liquor unloaded there, and that Marsh, before he died, always kept a fruit jar full of bills of large denominations; that he thought there might be several thousand dollars in it; that Marsh had recently died and there would probably be some insurance money also; that he knew Mrs. Marsh did not do any banking and that a large sum of money might be expected from that particular robbery. He advised them, according to Cox, that he could not participate personally because they were well acquainted with him, and he had been a pall-bearer at the funeral of Marsh as well as having had slot machines in their place for a long time. He is said to have described Steve Marsh so they would be sure and recognize him and told them to call him "Steve" and to get in under the pretext that they were deputy sheriffs with a search warrant; that he felt sure they would be let in without any trouble, because he happened to know that the slot machines had been removed a week or so previously. Cox further testified that Prief was called into the conference for the purpose of furnishing the necessary revolvers; that Prief had two revolvers—one a 45-caliber black gun and the other a 32- or 38-caliber gun which had been nickel-plated and was somewhat worn. He went on to testify that Prief had furnished the guns and upon examination discovered that they needed oil, and he got an oil can and put them in first-class working condition; also that Prief furnished them with a quart of whisky and

four dollars for expenses for gasoline, oil, etc., and offered such further services as might be needed. Cox further testified that Kendall first took Smythe and then himself in his car, drove around past the Marsh place, showed them the lay of the job, and pointed out the side door through which entrance could be obtained.

Kendall and Prief each denied the testimony of Cox, and each of them offered witnesses, in the nature of alibi witnesses, tending to prove they were at other places in Peoria at the times when Cox stated they were in the room at the hotel. Prief admitted that he had had two revolvers similar to those described by Steve Marsh as being used in the hold-up, but claimed that he had missed them from a drawer in his desk about the time Adams checked out of the hotel on the sixth of February. He testified on cross-examination that he had not made any request of Adams to return the revolvers after he came back to the hotel on the ninth of February nor had any conversation with him about the matter.

It is urged on behalf of plaintiffs in error that the conviction, resting as it does largely upon the testimony of an accomplice, should be set aside by reason of the unreliability of such evidence; that the evidence does not prove plaintiffs in error guilty beyond a reasonable doubt; that the court erred in refusing to permit character witnesses on behalf of Kendall to testify to his good reputation for truth and veracity; that the court erred in the giving of certain instructions, and that it erred in refusing to permit Kendall's wife to testify in his behalf.

It is true, as contended by plaintiffs in error, that the testimony of a confessed accomplice must be received and acted upon with caution and that it is subject to grave suspicion. (*People* v. *Johnson,* 314 Ill. 486; *People* v. *Elmore,* 318 id. 276.) It is also true that the testimony of an accomplice is competent, and if, after all the facts and circumstances in evidence are considered, such testimony

is sufficient to prove guilt beyond a reasonable doubt it will authorize a verdict of guilty whether corroborated or not. (*People* v. *Levy*, 351 Ill. 110; *People* v. *Rongetti*, 338 id. 56; *People* v. *Hoffee*, 354 id. 123.) While in this case the conviction of plaintiffs in error is very largely dependent upon the testimony of Cox, it cannot be said that that testimony is unsupported or uncorroborated. There is considerable evidence in the record, both for the People and for plaintiffs in error, tending to corroborate this evidence, and also many persuasive facts and circumstances. Cox and Smythe were both entire strangers in Peoria, arriving there before daylight. After calling at an address on North Monroe street they were in some mysterious manner directed to the Floyd Hotel. This gap is not filled in by any evidence, but it is admitted by Prief in his testimony that they did come to the Floyd Hotel inquiring for Adams, who was registered there by the name of Baxter, and that Baxter (or Adams, whatever his name may be,) had previously told Prief that he was expecting a man from Terre Haute. Cox testified that on the afternoon before the hold-up Kendall took him to the same North Monroe street address, which appears to have been a house of ill-fame, and Kendall in his testimony stated that he went to an address in the fourteen hundred block on North Monroe street. Kendall said he met a Miss White and a Miss Walker at that address, and Cox, an entire stranger in Peoria, mentioned the name of a Miss Walker he had met there. There is sufficient evidence in the record to make it clear that there is some connection between the North Monroe street address, the Floyd Hotel, and Kendall, Prief and Cox. Cox is further corroborated in his testimony by the testimony of Prief, who admitted receiving Cox and Smythe in the early morning of that day and admitting them to Adams' room after being told they came from Indiana. He further testified that Adams had arranged for him to admit anyone from Terre Haute. Cox

further testified that Adams' room in the hotel was No. 10 on the third floor, which is admitted to be correct by Prief in his testimony. Cox testified that Adams called Kendall and that Kendall came to room 10 at the Floyd Hotel in the morning of that particular day. Kendall in his testimony admitted that he went to the Floyd Hotel, but claimed that it was in the afternoon of that day and that he did not see anyone there except a farmer sitting in the lobby. Cox further testified that Kendall suggested the Marsh job and gave full details as to the family, the family history, the fruit jar with money in it, the recent death and funeral of Marsh, Sr., how they never banked any money, and that there was probably some insurance money there besides that which they previously had. Steve Marsh testified that one time he had heard his father tell Kendall about having some money buried in a fruit jar, and Mrs. Marsh testified to a conversation between Kendall and her husband in which the husband had stated that when he had money he put it in a fruit jar to save it. It is entirely inconceivable that any stranger upon his first visit to Peoria could have known all of the details of the Marsh home, which Cox and Smythe knew, when they went there for the robbery, unless they had been told by someone intimately connected with the Marsh family. The witness Cox is again corroborated by the testimony of both of the Marshs to the effect that Prief furnished the two guns. They described the two guns used exactly as Cox described the guns obtained at the Floyd Hotel. Furthermore, Prief in his testimony admitted the ownership of two such guns but claimed he had missed them about a week before the hold-up. He tried to insinuate in his testimony that Adams may have taken the guns when he checked out on the sixth of February, but his testimony further discloses that Adams returned on the ninth and stayed until the fourteenth without his ever making any inquiry of him about the guns or asking for their return during that period of time. Cox

testified that Kendall gave him specific instructions as to the plans for the home, describing the side door, and describing Steve Marsh as a tall, dark-complectioned fellow and telling him to call him "Steve." Both of the Marshs testified that immediately upon Cox and Smythe gaining entrance they demanded to know where the fruit jar was kept, and Cox went to the basement looking for it at the place he testified Kendall had told him to look.

Where the testimony is conflicting this court will not substitute its own judgment for that of a jury in merely weighing the credibility of the witnesses. (*People* v. *Binger,* 289 Ill. 582.) There is ample evidence in the record to justify the finding of guilty against plaintiffs in error, and we would not feel justified in substituting our judgment for that of the jury, who saw the witnesses and heard them testify. We must therefore decline to set aside the verdict because it is claimed to be contrary to the weight of the evidence.

It is urged that the trial court erred in refusing to permit the wife of Kendall to testify in his behalf, and in support of this contention we are cited to the case *Funk* v. *United States,* 78 Sup. Ct. 231. It was there held that the reason for the common law rule prohibiting a husband or wife from testifying for or against each other no longer exists, and it abrogates that rule so far as practice in the Federal courts is concerned. In this State the legislature has made certain changes in the common law rule in respect to the testimony of husbands and wives, and it doubtless will from time to time make such further changes as may be thought best. We leave this matter to that branch of the State government and hold that the trial court did not err in excluding the wife's testimony. *People* v. *Reno,* 324 Ill. 484; *People* v. *Jordan,* 292 id. 514; *People* v. *Green,* 276 id. 346.

It is next argued that the court erred in refusing to permit Kendall to prove his general reputation for truth

and veracity. In this there was no error. The crime charged was one of violence, and the qualities of truth, and veracity are irrelevant thereto. *People* v. *Celmars,* 332 Ill. 113; *People* v. *Redola,* 300 id. 392.

Complaint is made of the giving of two instructions on behalf of the People. These instructions were as follows:

"The court instructs the jury that where an alibi is relied on as a defense, in order to maintain it, it is incumbent on the defendant to support it by such facts and circumstances as are sufficient, when considered in connection with all the other evidence in the case, to create in the minds of the jury a reasonable doubt of the truth of the charge against the defendant."

"The court instructs the jury that before a defendant can avail himself of the defense of an alibi, the proof must cover the whole of the time of the commission of the crime, so as to render it impossible or highly improbable, that the defendant could have committed the act, and unless the proof in a case covers the whole time, so as to render the commission of the crime by a defendant impossible or highly improbable, then that defense is not available to such defendant."

It is argued by plaintiffs in error that their defense was not one of alibi and that said instructions are misleading. Various witnesses were produced who claimed to have seen plaintiffs in error at different times and places, which would tend to contradict and place discredit upon the testimony of Cox, and it is said by plaintiffs in error that such was the purpose of the evidence and not for the purpose of proving any alibi. Admitting this to be true, it does not follow that they were in any way prejudiced by these instructions. Their part of the crime was committed at the Floyd Hotel as accessories before the fact, and it might readily have been understood by the jury that the purpose of the evidence offered was as much to establish an alibi for the defendants as to contradict the testimony of Cox.

458

These instructions have been approved by this court in *People* v. *Thompson,* 321 Ill. 594, and *People* v. *Schladweiler,* 315 id. 553, and we do not feel that their having been given was prejudicial to the rights of plaintiffs in error.

The judgment of the circuit court of Peoria county is affirmed.

*Judgment affirmed.*

STONE, DEYOUNG and HERRICK, JJ., dissenting: We do not agree with the judgment as to the plaintiff in error Prief.