**UNITED STATES v. GLASSER et al.**
Nos. 7315–7317.

Circuit Court of Appeals, Seventh Circuit.
Dec. 13, 1940.

Rehearing Denied Jan. 23, 1941.

692

694

John Elliott Byrne, Joseph R. Roach, and Alfred E. Roth, all of Chicago, Ill., for appellants.

William J. Campbell, Martin Ward, and Francis J. McGreal, U. S. Attys., all of Chicago, Ill., for appellee.

Before SPARKS, TREANOR and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This is an appeal from a judgment rendered on a verdict of guilty upon an indictment charging the above named defendants, together with Anthony Horton and Louis Kaplan, with a conspiracy to defraud the United States under Section 37 of the Criminal Code, R.S. Sec. 5440, 18 U.S.C.A. § 88. All of the defendants were found guilty. Glasser, Kretske and Kaplan were each sentenced to imprisonment for a term of 14 months, Horton was placed on probation, and Roth was ordered to pay a fine of $500. Only Glasser, Kretske and Roth separately appealed.

The defendants demurred to the indictment and entered a motion to quash on the grounds: (1) That the grand jury was illegally constituted because women were excluded therefrom; (2) that the indictment was not properly returned in open court; and (3) that it was defective. The demurrers and the motion to quash were overruled.

On oral argument the principal point stressed was that the evidence failed to sustain the verdict of the jury, although other points were raised in the briefs. All of these will be discussed in due course.

▇▇▇ *The Motion to Quash.* It is claimed that the District Court erred in overruling the motion to quash the indictment, because the grand jury that found and presented the indictment was not lawfully constituted, in that. the commissioner appointed to select the grand jury selected no women to serve on the grand jury.

The indictment was filed on September 29, 1939. On May 12, 1939, the Legislature of the State of Illinois enacted an Act[1] making women eligible for jury. The constitutionality of that Act was sustained on August 8, 1939, in People v. Traeger, 372 Ill. 11, 22 N.E.2d 679. The Northern District of Illinois is composed of 18 counties of the State of Illinois. Under the Act in question the county boards of 17 of these counties were privileged to wait until September 1, 1939, before including women on the jury lists. The members of the September 1939 grand jury were summoned for duty on August 25, 1939. It follows that there was no irregularity in not including women on the jury list. Moreover in the affidavits filed in support of the motion to quash, it was not alleged that the appellants have been prejudiced in any way or that anyone of the grand jurors was incompetent or in any way disqualified. Under such circumstances irregularities in the selection of jurymen are to be disregarded. Wolfson v. United States, 5 Cir., 101 F. 430; Moffatt v. United States, 8 Cir., 232 F. 522; and Petition of Salen, 231 Wis. 489, 286 N.W. 5. The reason for this rule is that the grand jurors do not try the case but merely charge the accused. The manner. of their selection is of no consequence to him, he being entitled to claim only fair and impartial grand jurors who possess the necessary qualifications, whereas it is of great consequence that the administration of justice shall not be delayed by mere technical objections. People v. Lieber, 357 Ill. 423, 436, 192 N.E. 331.

*Was the Indictment Properly Presented?* The point is made that to constitute a valid indictment, it must appear that the indict-

[1] Ill.R.S.1939, Sec. 1, Chap. 78. "The county board of each county shall, at or before the time of its meeting, in September, in each year, or at any time thereafter, when necessary for the purpose of this Act, make a list of sufficient number, not less than one-tenth of the legal voters of each sex of each town or precinct in the county, giving the place of residence of each name on the list, to be known as a jury list."

ment was presented in open court and the fact entered of record.

■■ It is true that a defendant cannot rightfully be put upon trial for a criminal offense prosecuted by an indictment unless the record shows that the indictment was returned into open court by a grand jury. It need not, however, appear by any set form of phraseology that the grand jury appeared in open court and returned the indictment. All that is necessary is that by apt words it must be made to appear from the record that the grand jury appeared in open court and returned into court the indictment to which the defendant is required to plead. The record now before us shows that it contains a placita in regular form showing the convening of the court and recites the presence of the Judges of the Court of the Northern District of Illinois, Eastern Division, the United States Marshal and the Clerk of the Court; that on September 29, 1939, at a regular term of the District Court of the United States for the Eastern Division of the Northern District of Illinois, the grand jury returned four indictments in open court. On the face of the indictment in this case in the handwriting of the Clerk of the Court is the statement, "Filed in open court this 29th day of September, A. D. 1939, Hoyt King, Clerk," and preceding this statement is a notation "A true bill," "George A. Hancock, Foreman." We are of the opinion that the record in this case is sufficient, and the contention cannot be sustained.

*Is the Indictment Defective?* The indictment charged a conspiracy to defraud the United States under Section 37 of the Criminal Code, 18 U.S.C.A. Section 88, which provides that: "If two or more persons conspire * * * to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both." Now, the appellants make the point that the indictment is defective, because (a) it is duplicitous, (b) it is repugnant and inconsistent, and (c) it is vague and indefinite.

The indictment in substance charged that the defendants and divers other persons to the grand jurors unknown, conspired to defraud the United States of and concerning its governmental function to be honestly, faithfully and dutifully represented in the Courts of the United States by an Assistant United States Attorney, to prosecute certain delinquents for crimes and offenses cognizable under the authority of the United States as the same should be presented and determined according to law and justice, free from corruption, improper influence, dishonesty or fraud, and more particularly its right to a conscientious, faithful and honest representation of its interest in certain suits and causes brought 'and pending in the United States in the Northern District of Illinois by promising, offering, causing and procuring to be promised and offered, money and other things of value to an officer of the United States, and to persons acting for and on behalf of the United States in an official function under and by authority of a department and office of the Government of the United States, with intent to influence his decision and action on certain questions and causes which were at times pending, and which were by law brought before such officer in his official capacity, and with the intent to influence to commit and in committing, and to collude in committing certain frauds on the United States, and to induce such officer to do and to omit from doing certain acts in violation of his lawful duty.

The indictment further alleged that Glasser was an Assistant United States Attorney for the Northern District of Illinois, employed to prosecute all delinquents for crimes and offenses cognizable under the authority of the United States, and as such he did act for and on behalf of the United States in certain official functions under and by authority of the Department of Justice of the United States, and as such officer he had certain decisions to make and actions to take on certain questions, causes and proceedings brought before him in the performance of his duties as such Assistant United States Attorney; that it was part of the conspiracy that the defendants would solicit certain persons named in the indictment, charged with violating or about to be charged with violating the laws of the United States, to promise or cause to promise money to be paid or pledged to the defendants to be used to influence and corrupt Glasser in his official capacity in his decisions on certain questions, causes and proceedings, with the intent that the defendants would accept and use said money to corruptly, wrongfully and improperly influence Glasser in his decisions and thus allow a fraud to be

committed on the United States in violation of his lawful duties as an Assistant United States Attorney.

The indictment further alleged that Glasser would meet and hold conversations with the other.defendants and inform them what they should do to carry out the conspiracy and would instruct them as to what steps or action each of them would take in the matters in which he was representing the United States Government and thus Glasser conspired with the other defendants to defraud the United States of and concerning its governmental function to be honestly, faithfully and dutifully represented in the courts of the United States by an Assistant United States Attorney.

The Government furnished the appellants with a bill of particulars in which many overt acts were specified, in each of which one or more of the alleged conspirators is alleged to have participated.

█ █ It is claimed that the indictment is duplicitous because, it is said, it charges two offenses. With this contention we cannot agree for the reason that in our opinion the indictment charges merely a conspiracy to defraud the United States Government, entered into between an Assistant United States Attorney, the defendants Kretske, Roth, Horton, Kaplan and other persons to the grand jurors unknown. Nor is the indictment repugnant and inconsistent on the ground that it alleges that the defendants conspired with each other and with other persons to the grand jurors unknown. United States v. Heitler, D.C., 274 F. 401; United States v. Manton, 2 Cir., 107 F.2d 834, 839.

█ Appellants also complain that the indictment is defective because it alleges a case where concerted action is necessary, and that in such a case, conspiracy will not lie, and they cite a line of cases[2] where that principle has been upheld. These cases are not in point for the reason stated in United States v. Manton, supra. In that case it was charged that the defendants had conspired to defraud the United States of and concerning its right to have the lawful functions of the judicial power of the United States exercised and administered free from corruption, improper influence, dishonesty and fraud. In disposing, ad-

versely to the defendants, of a like contention as is here made, the court said (page 839 of 107 F.2d): "The indictment does not charge as a substantive offense the giving or receiving of bribes; nor does it charge a conspiracy to give or accept bribes." So also in our case the indictment charges a conspiracy to defraud the United States of and concerning its governmental function to be honestly and faithfully represented in the courts of the United States by an Assistant United States Attorney, to prosecute delinquents for crimes, free from. corruption, dishonesty and improper influence. See also Miller v. United States, 2 Cir., 24 F.2d 353; Cendagarda v. United States, 8 Cir., 64 F.2d 182; and Chadwick v. United States, 6 Cir., 141 F. 225.

█ The appellants also contend that the indictment does not advise them of the nature of the charge against them with reasonable particularity as to the persons, time, place and circumstances. Each of the appellants raises this point in his brief, but no one of them argues the point. To us it seems that the indictment sufficiently apprised the appellants of the charge against them.

We come now to the main question in the case: Whether there was sufficient evidence to support the verdict. It is argued by Glasser that there is no evidence whatever that he conspired with anyone for any purpose or that he solicited or received any bribes or that he was influenced in his official decisions. Kretske argues that the testimony tending to connect him with the offense charged, was entirely that of accomplices and therefore does not rest upon a substantial evidential basis. And Roth argues that the case rests on conjecture, suspicion and inference, and that the evidence as to him is wholly consistent with his innocence.

In order to consider the error here assigned, it is imperative that we analyze appellee's evidence in the light of the charge made in the indictment. This we have done.

The trial was long, consuming about 26. days, and the record is voluminous, consisting of the testimony of 106 witnesses. and a large number of exhibits. Undoubtedly it would be interesting to detail the evidence at length, but that would unduly

---

[2] Gebardi v. United States, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206, 84 A.L.R. 370; United States v. Sager, 2 Cir., 49 F.2d 725; United States v. Hagan, D. C., 27 F.Supp. 814; United States v. N. Y. C. & H. R. R. Co., C.C., 146 F. 298; and United States v. Dietrich, C.C., 126 F. 664.

lengthen this opinion. We think it will suffice if we but enumerate the more important facts and appellants' connection or association with the suits and matters involved in the conspiracy.

From the record it appears that from March 13, 1935 to June 23, 1939, Glasser was an Assistant United States Attorney and that Kretske was an Assistant United States Attorney from October 1, 1934, to April 15, 1937, both assigned to the handling of Alcohol Tax Law violations. Horton was a professional bondsman and provided sureties for persons required to give bond involving violation of laws brought against such persons by the United States. He met and spoke frequently with Glasser and Kretske in the United States Court House.

One of the matters involved in the conspiracy related to a Chrysler Sedan. It was a libel action in which it was charged that the automobile, seized upon the premises of one Leo Vitale at Peru, Illinois, had been used in connection with a liquor tax violation. The cause came up for hearing before a District Judge on December 23, 1938. Appellee was represented by Glasser, and Roth represented Rose Vitale, wife of Leo Vitale. Roth informed the trial court that the automobile belonged to Mrs. Vitale and had not been used in the manufacture of alcohol. Thereupon an investigator of the Alcohol Tax Unit, who had caused the seizure, informed Glasser that Roth was not informing the court of the true facts nor advising the court that Vitale had heretofore been convicted and sentenced to the penitentiary in the Southern District of Illinois for liquor tax violations, and requested that he be permitted to so advise the trial court. Glasser directed the investigator to leave the court room. The trial court ordered that the automobile be returned to Rose Vitale.

Shortly after December 23, 1938 this investigator informed Glasser that he had a number of witnesses to whom Vitale had said that he (Vitale) had "got out of this for $900" and the investigator suggested that Glasser inquire of Vitale as to who received the $900. Glasser said he would, but he never did.

Elmer Swanson and Patsy Del Rocco, in the latter part of 1936, were engaged in the illicit manufacture of alcohol at 116 W. 119th Street, Chicago, Illinois. The still was seized by the Government. Within a short time after the seizure Swanson met the defendant Horton, who informed Swanson that Swanson and Del Rocco were going to be indicted, but that he (Horton) could take care of it for $500 which would be taken down town and given to the boss. He mentioned "Red" as the boss. It is undisputed that Glasser has red hair and is known as "Red." The $500 was paid to Horton in currency. Nothing more was heard concerning the seizure of the still after the payment of the $500 nor were Swanson or Del Rocco indicted.

It further appears that on December 31, 1937, Swanson and the Hodorowicz Brothers operated another still at 6949 Stony Island Avenue, Chicago, Illinois, which also was seized by the Government. Swanson was arrested and arranged for a bail bond through Horton. Roth was retained as an attorney to defend, having been recommended by Kretske, whom Swanson had met at Hodorowicz' hardware store.

Frank Hodorowicz operated a hardware store at 11823 South Michigan Avenue and it was there, early in 1938, that Kretske, Horton, Hodorowicz and Swanson met. Horton introduced Kretske. There it was that Kretske said he would take care of the case; for $1,200 "it was supposed to be fixed up so nobody goes to jail." $500 in currency was paid to Kretske at his office, the balance to be paid later. At that conversation Kretske said: "Don't worry about a thing. Everything will be taken care of." Kretske also said that Glasser was to get part of the money and part was to take care of another lawyer.

The case was placed on Judge Woodward's calendar, Glasser representing the Government and Roth the defendants. On April 28, 1938, on Glasser's motion, the indictment was stricken with leave to reinstate. Swanson paid no money to Roth for his services.

Prior to September 1, 1937, an illegal still was being operated in a garage on 118th Place, Chicago. On September 1, 1937, investigators of the Alcohol Tax Unit raided the garage and arrested Peter Hodorowicz and Clem Dowiat. After the arrest Frank Hodorowicz called upon Kretske and inquired whether Kretske could take care of the case and was told that he (Kretske) "would have to look into it." Kretske told Hodorowicz to return in a few days. On September 23, 1937, Hodorowicz again called upon Kretske and was informed that for $800, to be delivered to Red, the case could be settled. Hodo-

rowicz gave Kretske $800. After the money was given to Kretske, Kretske informed Hodorowicz that "Everything is taken care of for to-morrow morning." The next morning Peter Hodorowicz and Clem Dowiat were discharged by the United States Commissioner.

It further appears that on June 3, 1938, Clem Dowiat and Frank and Peter Hodorowicz were indicted, charged with unlawful possession of distilled spirits. Roth was retained to represent the defendants, and while the case was pending in the District Court Frank Hodorowicz and Kretske had a conversation in which Kretske stated that nothing could be done for Hodorowicz because "There is too much heat." Thereafter Frank Hodorowicz called at Glasser's office and complained that he was getting a raw deal to which complaint Glasser replied: "Bailey says he will get my job if I don't put you away" and "all the money in the world * * * can't do you no good this time."

After this conversation Roth's services were dispensed with and other counsel represented the defendants in that case. They were found guilty and on appeal the judgment was affirmed. United States v. Hodorowicz et al., 7 Cir., 105 F.2d 220.

On September 10, 1935, while one Victor Raubunas was conducting a tavern in Chicago, the defendant Kaplan came to the tavern and suggested that Raubunas engage in the illegal manufacture of alcohol, assuring Raubunas that the business would be protected "through the Federal Building" but that it would cost $1,000 to secure the protection. Raubunas gave Kaplan $1,000 and thereafter Raubunas, Kaplan, Adam Widzes and one Ralph Bogush operated a still at 2524 South Western Avenue. On July 2, 1936, investigators of the Alcohol Tax Unit raided the premises and seized the equipment.

During 1936 Kaplan and Raubunas had other transactions involving the illegal manufacture of untaxpaid spirits and Raubunas made several visits to a garage operated by Kaplan at Kedzie and Ogden Avenues. On one of these visits he saw Kaplan enter an automobile with Kretske and Glasser and drive away with them.

In October or November of 1936 Raubunas, Kaplan, Edward R. Dewes and several other men operated a still, manufacturing alcohol, at Spring Grove, Illinois, until January 1937, when it too was raided by Government officers.

In July, 1937, the Alcohol Tax Unit brought to Glasser's attention the Western Avenue and Spring Grove still violations and requested prosecution. Written reports containing information implicating Kaplan, Raubunas and others were furnished. Glasser appeared before the grand jury. The grand jury returned a No Bill against Kaplan, Raubunas, Widzes and Bogush in the Western Avenue still.

It further appeared that the Alcohol Tax Unit commenced its investigation of the Spring Grove still on February 10, 1937, a final report being submitted to the District Attorney in July, 1937. Between February and July of 1937 several of the investigators held conferences with Glasser regarding the names of possible witnesses and their testimony. Glasser informed one of the investigators that he had heard that Kaplan was a notorious bootlegger and that there was sufficient evidence to obtain his indictment and conviction.

On May 15, 1938, after the defendant Horton had informed Edward R. Dewes that Kretske desired to see Dewes, Horton and Dewes called at Kretske's office. There Kretske advised Dewes that the grand jury was in session and that if Dewes could raise $100, he (Dewes) would not be indicted for the Spring Grove still. On May 17, 1938, at Kretske's office in the presence of Horton, Dewes gave Kretske $100. The money, Kretske said, would be sent over to the red-head.

It further appears that Glasser presented the evidence relative to the Spring Grove still to the grand jury on May 17, 1938, and told the jurors who should be named in the True Bill. Notwithstanding there was evidence implicating Kaplan, Dewes and Raubunas, a No Bill was returned against them.

On August 25, 1938, one Walter Kwiatkowski was arrested while driving an automobile containing untaxpaid alcohol, taken to Glasser's office and charged with unlawful possession of distilled spirits. He was released from custody upon a bail bond furnished by defendant Horton. Prior to the hearing before the United States Commissioner, Horton informed Kwiatkowski that "he could fix the case for $600." Kwiatkowski withdrew $3750 from his savings account in a Chicago Bank and gave Horton $600. The Commissioner dismissed the complaint. Glasser appeared for the Government.

On November 10, 1938, the Treasury Department requested Glasser to present the Kwiatkowski case to the Grand Jury. Glasser took no action in the matter.

In February, 1938, Investigator Thomas Bailey informed Glasser that one Frank Brown, recently convicted of a liquor violation and confined in the Cook County Jail, desired to impart information relative to others implicated in the violation. Brown was brought to Glasser's office and there stated that one Nick Abosketes was connected with the illegal operation of the still upon the Murdock Farm, in Illinois. Shortly thereafter one William M. Brantman from Chicago, called Nick Abosketes over the telephone at Milwaukee, Wisconsin. The following day Abosketes came to Brantman's office in Chicago. Brantman told Abosketes that he had connections with the Federal Building and could stop things, and that Brown had given certain information to the Federal people connecting him with the Murdock Farm still. On April 19, 1938, Abosketes paid Brantman $3,000 in cash, obtaining therefor a receipt in which Brantman stated the money was being paid on account of services. Brantman never rendered any service to Abosketes. Several weeks later Brantman called upon Abosketes at Milwaukee and informed Abosketes that every thing was stopped and under control. The record discloses that the $3,000 was delivered to Kretske.

The record further discloses that on September 30, 1938, Alexander Campbell, an assistant United States Attorney for the Northern District of Indiana, while at his office, at ten o'clock in the evening, in the Federal Building at Fort Wayne, Indiana, was visited by appellant Roth, who inquired whether the Wroblewski brothers had been indicted. He was told by Campbell that because of the absence of his filing clerk he was unable to give Roth the information he desired, but that he would have the files examined the next morning and inform Roth. Roth left the office and Campbell continued with his work for about 15 minutes.

After Campbell left his office that evening he met Roth who stated: "Mr. Campbell, if you find, when you check the records that the Wroblewskis are not indicted, and that their case has not been presented to the Federal Grand Jury, isn't there some way that some arrangement can be made so that they will not be indicted?

* * * I know all about Grand Juries. I know how they work. * * * Suppose I raise my fee $500 or $1000 and give it to you to handle this case." Upon being told "that is not the way we operate in the Northern District of Indiana", Roth replied: "Well, that is the way we handle cases in Chicago sometimes."

William and Edward Wroblewski were indicted and convicted on a conspiracy to violate the internal revenue laws of the United States and their conviction was affirmed, United States v. Wroblewski, 7 Cir., 105 F.2d 444. Roth represented the defendant in that case.

On July 10, 1939, Roth and Kretske called at Campbell's office and Roth inquired, not however in the presence of Kretske, if Campbell knew Investigator Bailey and then said: "Well, Bailey is conducting some sort of investigation in Chicago, he is trying to involve a lot of Chicago people, he is trying to involve certain lawyers in Chicago, * * *. Can't you pull Bailey off? * * * I don't want to get mixed up in this investigation, * * *. It will be a mess, * * *."

The appellants denied all of the incriminating evidence and each adduced testimony that his reputation as a law abiding citizen was good. In addition, Glasser presented the testimony of several of the Judges of the District Court, who testified to specific acts of and conversations with Glasser and representatives of the Alcohol Tax Unit and stated that so far as they could observe he rendered the Government conscientious service.

It is upon this state of the record that we are asked to hold that there was not sufficient evidence to support the verdict.

■ In considering this contention of the appellants it is well to remember that in passing upon the sufficiency of the evidence, we cannot weigh or determine the credibility of witnesses. We must take that view of the evidence less favorable to the party against whom the verdict is given and sustain the verdict if there be substantial evidence to support it.

■ A conspiracy is an offense which is usually established by a great number of apparently disconnected circumstances which, when taken together, throw light on whether the accused have an understanding or are in common agreement. The agreement need not be in any particular form. It is sufficient that the minds of

the parties met understandingly. A mutual implied understanding is sufficient so far as the combination or confederacy is concerned. The agreement is generally a matter of inference, deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose, that is to say, it is not necessary that the participation of the accused be shown by direct evidence. The connection may be inferred from such facts and circumstances in evidence as legitimately tend to sustain that inference.[3] This is so because it is rarely capable of proof by direct evidence.

In our case it was the province of the jury to consider the following noteworthy and expressive circumstances and the reasonable inferences that follow therefrom: (1) The relations existing between Glasser and Kretske while employed as Assistant United States District Attorneys and after Kretske's separation from the service. (2) The relations between Kretske and Roth and Roth's employment in liquor violations upon Kretske's recommendation. (3) The relations between Glasser, Kretske, Horton and Kaplan. (4) The knowledge that Horton had concerning the proposed indictment of Swanson and Del Rocco; the payment of $500 to Horton; and the failure to indict Swanson and Del Rocco. (5) The meeting of Kretske at Hodorowicz's store; the recommendation of Roth as attorney to defend; the payment of currency to Kretske; the statement of Kretske "not to worry everything will be taken care of;" Glasser to receive part of the money; and the striking of the indictment. (6) The payment of $800 by Frank Hodorowicz to Kretske to be delivered to Red; Kretske's statement "Everything is taken care of for to-morrow morning;" and the discharge of the violators the next morning. (7) The indictment of Dowiat, Frank and Peter Hodorowicz; the retaining of Roth to defend; and his discharge after Hodorowicz was told by Glasser that "all the money in the world could do him no good this time." (8) The relations between Raubunas and Kaplan and between Kaplan, Kretske and Glasser. (9) Glasser's conduct and actions relative to Raubunas, Kaplan and Dewes concerning the Western Avenue and Spring Grove stills. (10) Glasser's actions and conduct concerning Brown and Abosketes; and the payment of $3,000 by Abosketes to Brantman and by Brantman to Kretske. (11) The conduct and statements of Roth in the Wroblewski case.

True it is, that if the evidence is as consistent with the innocence of the appellants as with their guilt, no conviction can be had. It is equally true that overt acts of the parties may be considered with other evidence and attending circumstances in determining whether a conspiracy exists. Where the overt acts are of a character that are usually, if not necessarily, done pursuant to a previous scheme and plan, proofs of the acts has a tendency to show such pre-existing conspiracy, so that when proven they may be considered as evidence of the conspiracy charged, and if the established facts and inescapable inferences are inconsistent with the accused's professions of innocence, it becomes the problem of the jury to weigh the evidence and determine, under proper instructions dealing with the quantum of proof necessary to convict, the guilt or innocence of the accused.

And so in this case it was proper for the jury to consider all of the evidence and from all the facts and circumstances including those above enumerated to determine what witnesses it believed or did not believe, and to say whether the conspiracy charged in the indictment had been established beyond a reasonable doubt. This the jury has done, rendering a verdict against the appellants. We have considered this record and are compelled to the conclusion that the verdict is supported by substantial evidence.

It is next urged that the trial court erred in overruling Kretske's motion for a continuance and in appointing Glasser's attorney to represent Kretske. The record discloses that the case proceeded to trial on February 5, 1940. On November 2, 1939, attorneys Harrington and McDonnell entered their appearance as attorneys for Kretske. The case was set for trial to commence January 29, 1940. On that day Mr. Harrington appeared before the court and stated that he was engaged in a trial of a case in an Illinois State Court. The court thereupon continued the case to

---

[3] Gerard v. United States, 7 Cir., 61 F. 2d 872; United States v. Wroblewski, 7 Cir., 105 F.2d 444; Goode v. United States, 8 Cir., 58 F.2d 105; Feigenbutz v. United States, 8 Cir., 65 F.2d 122 and United States v. Manton, 2 Cir., 107 F. 2d 834.

February 5, 1940, and stated that the cause would have to proceed to trial on that date, and that Mr. Harrington's office would have to take care of Kretske's defense or Kretske would have to retain other counsel.

On February 5, 1940, Mr. Harrington not appearing, a motion for a continuance was made and denied and Mr. McDonnell was directed to act for Kretske until Mr. Harrington's arrival. Thereupon Kretske stated that he had just spoken to Mr. Stewart and if the court would appoint him, he would act as Kretske's attorney. Glasser objected to the appointment of Mr. Stewart. Notwithstanding Glasser's objection Mr. Stewart accepted the appointment and thereafter represented both Kretske and Glasser throughout the trial.

■■■■■ The action of the trial court upon an application for a continuance is purely a matter of discretion, and not subject to review unless it be clearly shown that such discretion has been abused. We cannot say, under the circumstances, the trial court abused that discretion, nor can we say that the appointment of Mr. Stewart and his acceptance of the appointment as attorney for Kretske was such an error as to warrant a reversal.

■■■■■ Appellant Roth next argues that the District Court abused its discretion in denying him a severance. In his petition for a severance Roth alleges that evidence of solicitations and promises would be introduced as well as conversations between the other defendants and various persons with which he had no connection, all of which would prejudice him before the jury. We are unable to hold that in denying a severance there was an abuse of discretion. Moreover, Roth could not successfully demand a separate trial because an unfavorable atmosphere might be created by the presence on the trial of co-defendants. McDonald v. United States, 8 Cir., 89 F.2d 128.

We come next to the contention that error was committed in admitting Exhibits 81a and 113. These exhibits are reports of the Alcohol Tax Unit. Exhibit 81a pertains to Raubunas, Kaplan and others relative to the Western Avenue still and Exhibit 113 refers to the Spring Grove still.

These reports contained information which the investigators obtained regarding the stills. It is said they were inadmissible because they contained hearsay information, referred to Kaplan as of Jewish descent and made mention that Kaplan and Dewes had been arrested in connection with the killing of one Tony Pinna at Kaplan's garage. (The cross-examination of Dewes by counsel for Glasser and Kretske established the fact that a man had been killed by Dewes in protecting Kaplan from kidnappers.) In addition Glasser makes the point that Exhibit 113 was inadmissible because the Spring Grove still case was presented to the grand jury.

■■■■ The information concerning the nature of the violations and the names and history of the alleged violators enabled the Assistant United States Attorney in charge of the cases to have completed information concerning the conduct and history of the alleged offenders, and brought to Glasser's attention information for him to either act or not act upon. The information contained in the reports together with Glasser's conduct in these cases threw light upon the question whether the United States was being deprived of the honest and conscientious services of an Assistant United States Attorney. We do not think that the mere fact that the racial descent of Kaplan was mentioned in the report was prejudicial. Besides, as the record indicates, the trial court, at the time the Exhibits were received in evidence, instructed the jury that the contents of the reports were not evidence against Roth and Kretske. For these reasons we think the contention is not tenable.

■■■ It is also claimed that the trial court sent to the jury Exhibits 92 and 115. Counsel for appellee however say they were not sent to the jury. In the trial of the case some 230 exhibits were offered by the parties. The bill of exceptions discloses that when these exhibits were offered in evidence, objection to their introduction was made and sustained. It also discloses that immediately after the defendants rested their case, the Government offered a large number of exhibits in bulk and mention is made of exhibit 92. There appears to have been no objection to the introduction of these exhibits. It also appears that on May 17, 1940, the trial court entered an order directing the Clerk of the District Court to certify and send to this court all of the exhibits introduced on behalf of the parties. The Clerk of the District Court, in so certifying, does not certify that exhibit 92 was sent to the jury. From the record thus appearing we are unable to say that these exhibits were sent to the jury.

702

We now consider appellants' contention that the court erred in permitting appellee to introduce evidence concerning Investigator Bailey. It appears that Roth in his direct examination, over Glasser's objection, testified that Glasser had heard that Bailey had been ordered from a court room by a Federal Judge for misconduct in preparation of cases. Upon the cross-examination of Glasser he was asked if it was true that he had told Roth that Bailey had been run out of a Federal court room. No objection having been made to the question, he answered that he had so stated.

In rebuttal Bailey was permitted to testify that he had never been ordered out of any court room.

It is not permissible, under the guise of testing the credibility of a defendant, to question him on cross-examination about matters not touched upon in the examination in chief nor pertinent thereto, not tending to prove the charge upon which the defendant is being charged, Gideon v. United States, 8 Cir., 52 F.2d 427. Nevertheless, under the state of the record here appearing it was within the discretion of the trial court to allow this testimony in rebuttal and we cannot say that his conduct in this regard warrants reversal.

Next we are confronted with an argument made by appellant Glasser that the trial court erred in unduly restricting cross-examination of appellee's witness William J. Campbell. It appears that Glasser on direct examination had testified that Mr. Campbell, who was then the United States Attorney for the Northern District of Illinois, had said to Glasser that he would tell the grand jury there was nothing in his (Glasser's) official conduct that would require investigation. Mr. Campbell, when called as a witness in rebuttal, was asked if he had made the following statement, theretofore testified to by Glasser: "Dan, I knew you were going in to the grand jury room this morning and I thought I would go in and put in a good word for you. I wanted to tell that grand jury there was nothing in your official conduct that would require investigation," and Mr. Campbell answered "I did not." Thereupon the trial court ruled that cross-examination of Mr. Campbell would be limited to the subject of his examination in chief. The general rule is that cross-examination should be confined to what was brought out on direct examination, but it is permissible in a proper case, on cross-examination, to ask an interested or hostile witness concerning acts or declarations showing bias and prejudice for the purpose of affecting the credibility of the witness. In such matters large discretion is committed to the trial judge in controlling the cross-examination and great latitude is permissible. We believe the ruling of the court in this case was not reversible error.

The next contention to which we will devote ourselves, is that the District Court erred in permitting the introduction of evidence concerning overt acts not mentioned in the bill of particulars.

The object of a bill of particulars is to give the defendant notice of the specific charges against him and to inform him of the particular transactions in question, so that he may be prepared to make his defense. Its effect, therefore, is to limit the evidence to the transactions set out in the bill of particulars. The prosecution, however, is not required to specify in the bill all the evidence it will produce in support of the charges, McDonald v. People, 126 Ill. 150, 18 N.E. 817, 9 Am.St.Rep. 547 and People v. Westrup, 372 Ill. 517, 25 N.E.2d 16, and it is competent, when the issue is whether the accused is guilty of a general conspiracy, to prove distinct overt acts in anyway connected with the conspiracy charged, McDonald v. People, supra, 126 Ill. page 162, 18 N.E. 817, 9 Am. St.Rep. 547. In our case appellants assert that the bill of particulars made no reference to the "One Chrysler Sedan" and the Edward and William Wroblewski case in the Northern District of Indiana. Our examination of the bill of particulars convinces us that sufficient appears therein to apprise the appellants that a proffer of evidence would be made concerning Leo Vitale, and we believe that it was competent, under the issues, to prove Roth's conduct in the Edward and William Wroblewski case. Furthermore, in the order directing the appellee to file a bill of particulars, appellee reserved the right to offer additional evidence.

Appellant Kretske also makes the point that "the testimony tending to connect the appellant with the offense charged in the indictment was entirely of accomplices, * * * and that there was no corroboration * * * of the character required by law * * *." With this statement we cannot agree for the reason

that there were corroborating witnesses of respectability whose testimony tended to establish the truth of the charge in the indictment. It is true, however, that much of the evidence tending to show Kretske's connection with the conspiracy came from the lips of professional still operators, bootleggers and illegal alcohol dealers, all of whom were either inmates of a Federal penitentiary, indicated for crimes for which they have not yet been prosecuted, or prosecuted and convicted and asking for probation. Nevertheless, as was said in the Manton case, supra, 107 F.2d page 843: "Indeed, in a case like this, it is unlikely that it would be otherwise." However that may be, the rule is that although the testimony of an accomplice should be subjected to close scrutiny and minute examination and weighed with great care and caution and although it may be attacked before the jury as incredible, unworthy of belief and prompted by unworthy motives; still a conviction may rest upon the uncorroborated testimony of an accomplice.[4] Since the record here does not disclose the trial court's instructions to the jury, we must assume that the trial court directed the jury that the testimony of the accomplices must be minutely examined and weighed with great caution. Kanner v. United States, 7 Cir., 34 F.2d 863.

 It is insisted that it was error to admit the testimony of Alexander Campbell, and the argument is made that his testimony was incompetent as not being a declaration in furtherance of a conspiracy to defraud the United States of the conscientious services of Glasser. To be sure, evidence which has little or no bearing on the charge against an accused is not to be admitted when it shows guilt of an independent crime, but evidence which tends to prove an issue material in a prosecution is not made inadmissible simply because it indicates in some way that a defendant has been accused of another crime. In our case we do not think reversible error was committed by the trial court in ruling on this evidence, for the reason that it is discretionary on the part of a trial judge to allow testimony which tends to throw light

upon a particular fact, explain the conduct of a particular person, or to show his purpose, knowledge or design.[5]

 Complaint is made and counsel for appellants earnestly argue that numerous prejudicial violations of their rights were committed by the assistant District Attorneys and that by reason thereof they were deprived of a fair and impartial trial.

It is argued:

(1) That the prosecutor caused the witness Elmer Swanson to change his testimony from the statement that the case was supposed to be taken care of for $800 to the statement that $500 was paid to Kretske and that there was still a balance of $700 to be paid.

(2) That the witness Dewes was caused to repeat the injurious testimony that Kretske said that he (Kretske) had to resign under pressure and for resigning Kretske was to be able to take care of cases. The record discloses that after the witness had testified as above noted the following occurred:

"Mr. McGreal (Assistant United States Attorney):

"Q. Repeat that, what was that? A. He said he resigned.

"Mr. Stewart: There is nothing wrong with our hearing. We all heard it, Judge. We heard it in the opening statement, now we hear it here.

"The Court: Let us hear it once more. Repeat the answer.

"The Witness: A. He said he resigned under pressure over here, and for holding the bag he was to receive favors over here.

(3) That the name of one Steve Schiavone, a bootlegger by reputation, was brought into the case for the purpose of prejudicing the jury. It appears that one of the overt acts mentioned in the bill of particulars related to the case of United States v. William J. Workman and 32 others. Workman, called as a witness for the appellee, testified that he was the owner of a warehouse in Chicago which he had rented to one Mathews, but that the rent had been paid in cash by one Steve Schia-

4 Arnold v. United States, 10 Cir., 94 F.2d 499, 501; Wolf v. United States, 7 Cir., 283 F. 885; Delvalley v. United States, 7 Cir., 88 F.2d 579, 581; Reuben v. United States, 7 Cir., 86 F.2d 464; and People v. Kendall, 357 Ill. 448, 192 N.E. 378.

5 Butler v. United States, 8 Cir., 53 F.

2d 800; Simpkins v. United States, 4 Cir., 78 F.2d 594; United States v. Pleva, 2 Cir., 66 F.2d 529; Farmer v. United States, 2 Cir., 223 F. 903; United States v. Sebo, 7 Cir., 101 F.2d 889; Devoe v. United States, 8 Cir., 103 F.2d 584; Witters v. United States, 70 App. D.C. 316, 106 F.2d 837, 125 A.L.R. 1031.

vone, one of the 32 mentioned in the indictment. The witness identified Schiavone from a picture shown to him in open court and offered in evidence as an exhibit. Our examination of the record does not disclose that either of the appellants objected to this testimony.

In support of this contention, counsel cite and place reliance upon United States v. Minuse, 2 Cir., 114 F.2d 36. In that case the defendants had been indicted for conspiracy to violate the provisions of the Securities Exchange Act of 1934, 15 U.S. C.A. § 78a et seq. One Frezise, cashier of a bank, called as a witness by the Government, was permitted to testify regarding his defalcations in the bank. The reviewing court was of the opinion that such testimony threw no light upon the issues, and reversed the conviction. It is obvious, under the circumstances in the instant case, that that case is not in point.

(4) That a photograph or picture of one Nick Gerardi was improperly admitted in evidence. It appears that in January, 1938, government officials raided and seized a still at 6309 Eggleston Avenue, Chicago, and arrested Tony Jurkas. Following the arrest Mae Jurkas, wife of Tony Jurkas, visited Glasser at his office and told him that Nick Gerardi was the owner of the still. Mae Jurkas was called as a witness for the appellee and after relating her conversations with Glasser she identified a picture of Nick Gerardi as being the man to whom she had referred. On the back of this photograph appears the following: "Remarks" "Auto thief; counterfeiter; small scar back left hand; round face; married; wife's name Congetta." It further appears that Glasser took no action concerning the alleged illegal operation of the still at 6309 Eggleston Avenue. Now, appellant argues that it was reversible error to introduce and send to the jury this photograph, and United States v. Dressler, 7 Cir., 112 F.2d 972, 973 is cited. We are of the opinion that the Dressler case is not in point, for the reason that the admission of the cards carrying the criminal history therein was that of the defendant while in our case it concerns a third party. Moreover, it does not appear that any objection was made to the introduction of the photograph.

We have not discussed all of the complaints mentioned in the briefs under this contention. However we have examined and considered all of them and conclude that neither those specifically above noted nor the others not discussed, warrant a reversal.

Considerable criticism is heaped upon the court in the conduct of the trial. The claim is made: (1) That the trial judge committed acts of advocacy advantageous to the appellee and injurious to appellants; (2) that he cross-examined Glasser in a hostile manner; (3) that he restricted cross-examination of appellee witnesses; and (4) that he made remarks favorable to appellee and prejudicial to appellants.

It is of course the duty of the trial judge to conduct the trial in an orderly way with a view to eliciting the truth and to attaining justice between the parties, and in so doing he has the authority to interrogate witnesses, Kettenbach v. United States, 9 Cir., 202 F. 377, 385. We agree with Judge Sanborn that: "It is not always possible during the trial of a hotly contested case for a judge, however impartial he may be, to maintain in the courtroom that atmosphere of complete judicial calm which is so much to be desired. We must not overlook the fact that the human element cannot be entirely eliminated from the trial of lawsuits. While counsel owe to the court, because of the position which he occupies, the utmost deference and respect, and while the court owes to them an equal obligation of courtesy and patience and consideration, nevertheless sharp differences of opinion do arise in the heat of trial and things are said which were better left unsaid. Such incidents are often regarded as trivial during the trial of a case and are quickly lost sight of, but, when set forth in the record and emphasized by counsel on appeal, they take on an importance which they never actually possessed. * * * An appellate court should be slow to reverse a case for the alleged misconduct of the trial court, unless it appears that the conduct complained of was intended or calculated to disparage the defendant in the eyes of the jury and to prevent the jury from exercising an impartial judgment upon the merits." Goldstein v. United States, 8 Cir., 63 F.2d 609, 613.

Whatever our personal desires might be, we are compelled to say that space does not permit us—nor would it serve any good purpose—to discuss in detail the instances claimed to be prejudicial.

Suffice it to say without further elaboration that we have examined every criticism made, considered them in connection with the entire record, and are satisfied that the complaints are of minor importance. They did not affect the substantial rights of the appellants, nor prevent the jury from exercising an impartial judgment on the merits.

 Finally, it is argued that the court erred in overruling the motion for a new trial. In their briefs appellants concede that the disposition of such a motion rests within the sound discretion of the trial judge, and that his ruling in granting or overruling a motion for a new trial is not subject to review by this court except for clear abuse of discretion. But they insist that the record discloses the District Court did abuse that discretion and they base their argument upon the fact that Glasser and Roth filed affidavits, alleging in substance that all the female names placed in the box from which jurors are selected were presented to the clerk of the court from a list made up by the Illinois Women Voters league to the exclusion of all other females; that the females selected by said league had attended jury classes maintained for the purpose of giving instructions to potential jurors; that lectures before the jury classes presented the views of the prosecution; and that females otherwise qualified and eligible for jury service were deliberately excluded from the box. It was also alleged that the affiants acquired knowledge of these facts after the verdict. Roth filed a second affidavit in which he alleged that one of the jurors was ill during the deliberations and about midnight requested that he be allowed to retire and that his request was denied.

In the instant case the trial court in passing upon the motion for a new trial did consider the affidavits filed and was convinced that the appellants were in no wise prejudiced by the incidents complained of. Under such circumstances we cannot say that the District Court had abused the discretion vested in it by law. Smith v. United States, 9 Cir., 231 F. 25 and N G Sing v. United States, 9 Cir., 8 F.2d 919.

We have now considered all of the assignments of error, and we are convinced that no error has intervened justifying a reversal. The judgments of the District Court will therefore be affirmed.